IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 92-3995

ABBEVILLE GENERAL HOSPITAL, ET AL.,

Plaintiffs-Appellants,

v.

DAVID L. RAMSEY, Secretary,
Department of Health and Hospitals, ET AL.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Louisiana

_____

(September 22, 1993)

Before EMILIO M. GARZA and DeMOSS, Circuit Judges and Zagel[1],
District Judge.

ZAGEL, District Judge.

A penny saved is a penny earned.  That is the formula for federal Medicaid law--hospitals that save dollars by operating efficiently and economically earn state and federal dollars to cover all operating costs.  The Medicaid Act,[2] specifically the Boren Amendment, provides that hospitals in participating states that operate "efficiently and economically" are entitled to reimbursement of costs which must be incurred. 42 U.S.C. § 1396a(a)(13)(A) (1991).  Louisiana's Medicaid plan adopts the same formula since Louisiana elected to participate in

_____

[1]District Judge of the Northern District of Illinois,
sitting by designation.

[2]Title XIX of the Social Security Act, 42 U.S.C. § 1396 et
seq., is commonly referred to as the Medicaid Act.

the joint federal-state Medicaid program and receive matching federal funds. Louisiana's Department of Health and Hospitals ("LDHH"), under the direction of its secretary, administers its Medicaid plan.

As a participating state, Louisiana must comply with the Medicaid Act and implementing regulations promulgated by the Health Care Financing Administration (HCFA). Amisub, (PSL), Inc. v. Colorado Dep't of Social Servs., 879 F.2d 789, 794 (10th Cir. 1989), cert. denied, 496 U.S. 935 (1990). The federal structure gives each state Medicare agency a certain degree of flexibility in developing its Medicaid plan. Each plan, however, must provide for the reimbursement of inpatient hospital services:

> through the use of rates . . . which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and federal laws, regulations and quality and safety standards.

42 U.S.C. § 1396a(a)(13)(A). In fact, the Supreme Court in Wilder v. Virginia Hosp. Assoc., 110 S. Ct. 2510 (1990), held that the leeway in adopting a method of computing rates does not relieve States of their obligation to pay reasonable rates. Id. at 2520. Once developed, each state must submit its plan to HCFA for approval. 42 U.S.C. § 1396. To secure HCFA approval, each state Medicare Agency must make findings and submit assurances to HCFA that: (1) the payment rates "are reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated providers"; (2) the methods and standards

2

employed "take into account the situation of hospitals which serve a disproportionate number of low income patients with special needs"; and (3) the payment rates "are adequate to assure that recipients have reasonable access, taking into account geographic location and reasonable travel time, to inpatient hospital services of adequate quality."  42 C.F.R. § 447.253 (b)(1)(i), (ii)(A), (ii)(C) (1992).  Such findings must be made and assurances filed with every amendment to established plans; findings must be made at least annually.  42 C.F.R. § 447.253 (a),(b) (1992).

LDHH first developed its Medicaid plan for inpatient hospital services in 1983.  Under the plan, LDHH reimburses hospitals 100 percent of all capital costs, educational expenses, and malpractice expenses.  The remaining operating costs are reimbursed either on a 100 percent basis or at a maximum level predetermined by each hospital's "target rate."  LDHH set each hospital's initial "target rate" as the higher of its 1980 and 1981 average operating costs per Medicaid discharge.  The plan allowed LDHH to increase these target rates in 1982, 1983, and 1984 in accordance with HCFA's inflation index published periodically.  In 1985 and 1986, LDHH submitted proposed amendments to freeze the target rates for cost reporting periods beginning July 1, 1985 through June 30, 1987.  HCFA approved this freeze.  In 1987, LDHH resumed its plan and increased target rates up to 2.3% under the HCFA index.  In 1988, LDHH again froze

3

target rates until July 1, 1990, despite HCFA's disapproval of the proposed amendment.[3]  Since then, target rates have increased annually by the amount of the applicable HCFA indices.

The dispute in Louisiana concerns whether LDHH made findings and submitted assurances as required by the Boren Amendment.  The Hospitals[4] here complain that LDHH did not apply the "penny saved, penny earned" formula outlined in the Medicaid Act in deriving the reimbursement rates set under Louisiana's initial Medicaid plan and amendments for the years 1985, 1986, 1988, 1989 and 1990.  The Hospitals filed a § 1983 action against the Secretary of LDHH and other agency officials, claiming their actions deprived them of rights secured under the Boren Amendment.  The Hospitals eventually moved for partial summary judgment declaring that LDHH failed, as a matter of law, to comply with the Boren Amendment when it established reimbursement rates and other payment schedules under Louisiana's Medicaid plan.  In the motion, the Hospitals challenged LDHH's assurances submitted to HCFA, insisting that LDHH failed to make any

---

[3]HCFA rejected LDHH's assurances and disapproved the 1988 amendment, stating that LDHH failed to "provide any information or data that demonstrates any relationship between [the 60 percent of the] facilities [being reimbursed their costs] and efficiency and economy. . . . [and] failed to substantiate its contention that its rates take into account economic conditions that will occur during the rate year."  (Letter dated December 20, 1989 from Louis B. Hays, HCFA Acting Administrator, to Carolyn O. Maggio, LDHH Director.)

[4]Fifty-eight Louisiana hospitals ("Hospitals") joined to file this federal suit.

"findings" that the rates set were reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated hospitals.

LDHH followed suit and filed a cross motion for partial summary judgment declaring that it complied with the findings process mandated in the Medicaid Act and its regulations. The district judge granted LDHH's motion for partial summary judgment, concomitantly denied the Hospitals' motion for summary judgement, dismissed the case in its entirety, and subsequently denied the Hospital's motion for a new trial, but amended his prior ruling.[5] The Hospitals now appeal. This Court has jurisdiction to hear their appeal under 28 U.S.C. § 1291.

---

[5]In their motion for new trial, the Hospitals assigned error to the district court's dismissal of their claims challenging the substantive adequacy of the rates not raised in the cross motions for summary judgment. The district judge denied the motion without addressing the issue. Rather, in the October 26, 1992 ruling, Judge Polozola stated:

> The Court deletes from its first opinion the reference that the HCFA had approved the 1988 "freeze" amendment. This is a clerical error on the Court's part and has no bearing on the Court's final decision. As noted in the first opinion, the approval by the HCFA is not binding on the Court, but is evidence which may be considered by the Court.

Both parties concede that summary judgment was sought only on LDHH's procedural compliance with the Boren Amendment. LDHH argues that summary judgment, declaring LDHH had made valid findings, automatically forecloses the Hospitals' challenge to the substantive adequacy of the rates set. See infra note 11, discussing propriety of district court's dismissal of case in its entirety. Still remaining unaddressed at trial are the Hospitals' claims related to outpatient services (subject of undecided motion to dismiss) and to the state plan's failure to provide adequate methods of accounting for changes in cases mix.

On appeal, the Hospitals seek review of the district court's grant of summary judgment and other adverse rulings. The Hospitals maintain that the district court erred when it: (1) applied the highly deferential "arbitrary and capricious" standard of judicial review to the procedural issue of whether the LDHH complied with federal law; (2) determined that, as a matter of law, LDHH complied with the Boren Amendment and was entitled to summary judgment; and (3) dismissed the entire case, including the substantive issues on the reasonableness and adequacy of the reimbursement rates, after ruling only on the preliminary issue of procedural compliance with the Boren Amendment.

## STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo, employing the same standard as a district court would employ under Federal Rule of Civil Procedure 56(c). Harbor Ins. Co. v. Urban Constr. Co., 990 F.2d 195, 199 (5th Cir. 1993). Summary judgment is proper only if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). All reasonable inferences are drawn in favor of the nonmoving party. Harbor, 990 F.2d at 199. The parties here do not dispute the material facts. They argue whether the facts of record support a judgment as a matter of law that LDHH made appropriate findings and assurances in compliance

6

with the Boren Amendment.  LDHH says "yes"; the Hospitals say "no."

LDHH has made its findings and submitted assurances to HCFA for approval of its initial Medicaid plan in 1984 and all subsequent amendments to the plan's reimbursement rates.  HCFA approved the plan and amendments to "freeze" reimbursement rates until 1988.  LDHH contends that this federal agency action entitles Louisiana's plan to a presumption of regularity and warrants application of the arbitrary and capricious standard for reviewing the record to determine whether LDHH complied with federal law.  LDHH cites a litany of cases for the indisputable proposition that a state agency's rate-setting action is entitled to considerable deference and is reviewable only under the arbitrary and capricious standard.[6]  But this rule does not resolve the specific question presented here.

There is a fundamental difference under the Medicaid Act between an agency's discretion to set reimbursement rates and an agency's mandatory compliance with the findings and assurances requirements.  It is LDHH's compliance or noncompliance with the findings requirement that is subject to cross motions for partial summary judgment.  The findings requirement is both a procedural

---

[6]See, e.g., Lett v. Magnant, 965 F.2d 251, 257 (7th Cir. 1992) (plaintiff must establish "that the plan is either arbitrary and unreasonable or inadequate" and agency's actions are presumptively valid); West Virginia Univer. Hosps., Inc. v. Casey, 885 F.2d 11, 23-24 (3rd Cir. 1989) (court must apply "deferential standard of review in assessing compliance with the [Boren Amendment's] 'reasonable and adequate' requirement").

and a substantive requirement--LDHH must **find** that the rates are reasonable and adequate and the plan must adopt rates that are **actually** reasonable and adequate. Wilder, 110 S. Ct. at 2519; Illinois Health Care Assoc. v. Bradley, 983 F.2d 1460, 1463 (7th Cir. 1993) (distinguishing between the Boren Amendment's procedural component that the agency make findings and assurances and its substantive component that the plan implemented result in adequate payments). The Hospitals complained below of LDHH's noncompliance in practice with the findings requirement and the plan's noncompliance with the substantive findings requirement. 42 C.F.R. § 430.35(C) (1992) ("A question of noncompliance in practice may arise from the State's failure to actually comply with a Federal requirement, regardless of whether the plan itself complies with that requirement.")).

What standard does a federal court use to determine whether LDHH complied with the procedural requirements of federal law, i.e., whether LDHH, in fact, made the "findings" stipulated in the Boren Amendment? Whether LDHH complied with the procedural requirements of the Boren Amendment is a question of law, subject to de novo review. Amisub, 879 F.2d at 795. On this point, most opinions are clear.[7] By conducting such a review of the agency's

[7]But see Illinois Health Care, 983 F.2d at 1462-63 (reviewing IDPA's procedural compliance with the findings and assurances requirement under the arbitrary and capricious standard). The Seventh Circuit states as its reason for deferential treatment of this issue that the Secretary's approval of the reimbursement plan renders the plan a "product of state and federal agency action." This reasoning, however, does not

8

actions, federal courts do not usurp the agency's permissible authority to balance political and financial interests underlying the Medicaid plan.

The opinions are not so clear on the proper standard for reviewing substantive compliance with the findings requirement.[8] The opinions generally recite the boiler plate language--_de novo_ review of procedural and substantive compliance with federal law and arbitrary and capricious review of nonadjudicatory agency actions.  Some opinions then proceed, we think, to conflate the

---

apply when the state makes findings.  The Secretary does not participate in the agency's findings process.  The Secretary's role is confined to reviewing the reasonableness of the state's assurances.  _Wilder_, 496 U.S. at 507-08.  The Secretary neither reviews the methodology for reimbursement nor scrutinizes the underlying findings.  _Id._ LDHH's findings, therefore, are not the product of state and federal agency action.

LDHH concedes in its brief that "conceivably a _de novo_ standard might be appropriate" where no findings are made.  Once _bona fide_ findings are made, however, LDHH's expertise and the Secretary's approval warrant the same degree of deference to the rate-setting decision as accorded a federal agency.  The court in _Illinois Health Care_ recognized that determining the median cost of operating nursing homes that retain a basic level of care and pass inspection is a matter "for the state to solve by combining its economic expertise with its practical knowledge."  983 F.2d at 1465.  But this expertise did not excuse the state agency's obligation to make findings which establish a nexus between the cost and the proposed reimbursement rates.

[8]In _Mississippi Hosp. Assoc., Inc. v. Heckler_, 701 F.2d 511 (5th Cir. 1983), we recognized this bedlam and "assum[ed] without deciding that by force of statutory or constitutional requirements, a district court is entitled to review the actions of a state agency administering federal Medicaid funding as it would review the actions of a federal agency."  _Id._ at 516.  We then proceeded, without further discussion, to determine whether both the plan's rates and the state Medicaid agency's findings were irrational and the product of arbitrary and capricious decision-making.  _Id._ at 516-519.

9

issues reviewable for substantive compliance with the Boren

Amendment with issues reviewable as otherwise nonadjudicatory

agency action.[9]   Both involve a review of the underlying factual

foundation and a substantive determination regarding the adequacy

of the payment rates.  Both implicate a balancing of policy and

financial considerations.  Both fall within the auspices of the

state agency's exercise of discretion.  Finally, both are

reviewed to some degree by the Secretary prior to approving a

plan or amendment.  See Illinois Health Care, 983 F.2d at 1465

("rate-setting and the identification of efficiently and

---

[9]The court in Amisub reviewed de novo whether the evidence
was sufficient to support the "finding" and assurances that
efficient and economical hospitals are reasonably and adequately
compensated.  879 F.2d at 797-799.  The opinion focused on (1)
the expert testimony that no hospital, no matter how efficient,
would be reimbursed for actual costs and (2) the program
director's testimony that the assurances rested solely on the
historical trend concept, i.e., the new system is adequate
because it pays the same as the old system, which was adequate.
The Tenth Circuit said that "[s]ince we find no evidence admitted
at trial to support appellee's 'assurances' on appeal, and find
overwhelming evidence to the contrary, we hold that the Colorado
Medicaid Plan, effective July 1, 1988, is violative of the
substantive provisions of federal Medicaid law."  Id. at 799.
    After this holding, the Tenth Circuit reviewed the record to
determine whether the state agency's findings and assurances were
reasonably related to a factual foundation or whether they were
arbitrary and capricious.  Id. at 799-801.  Here, the court
confined its review to whether the factors considered were
relevant.  The court then found that the "record is blatantly
devoid of any effort . . . to make the federally mandated
findings" where the assurances are based solely on budgetary
constraints.  Id. at 800.  The court ultimately remanded the case
and ordered the state agency "to comply with the procedural and
substantive requirements of the federal Medicaid Act and its
implementing regulations, and to engage in a bona fide findings
process before submitting any new plan and/or assurances to
HCFA."  Id. at 801.

economically operated facilities are all part of the same process") (quoting <u>Folden v. Washington State Dep't of Social & Health Servs.</u>, 744 F. Supp. 1507, 1533 (W.D. Wash. 1990)).

It is precisely the agency's exercise of discretion and the Secretary's approval that warrant application of the arbitrary and capricious standard of review. <u>Illinois Health Care</u>, 983 F.2d 1462-63 (reimbursement plan, approved by Secretary and product of federal-state agency action, must be reviewed with the same deference accorded federal agency actions); <u>Pinnacle Nursing Home v. Axelrod</u>, 928 F.2d 1306, 1313 (2d Cir. 1991). The reason for the policy of deferential review of a federal agency's interpretation of federal law is its "expertise and familiarity . . . with subject matter of its mandate and the need for coherent and uniform construction of federal law nationwide." <u>Turner v. Perales</u>, 869 F.2d 140 (2d Cir. 1989). The joint federal-state Medicaid program and the rate-setting flexibility mandated by the Boren Amendment evoke the same policy. This two-step review process--<u>de</u> <u>novo</u> review of the state's factfinding process and arbitrary and capricious review of the findings and rates--provides the "minimum necessary to assure proper accountability." S. Rep. No. 139, 97th Cong., 1st Sess. 478 (1981), <u>reprinted</u> <u>in</u> 1981 U.S. Code Cong. & Admin. News 396, 744.[10] It also strikes a balance between Congress's view of the

---

[10]In holding that the Boren Amendment creates a right enforceable under § 1983, the Supreme Court anticipated the debate over standards of review in this area. It stated, "That

11

federal role under the Medicaid Act and general principles of federalism, which do not permit states to be final arbiters of their compliance with federal law. Accordingly, a presumption of regularity and deferential standard attaches to LDHH's exercise of discretion in setting reimbursement rates, but only after a reviewing court determines that LDHH made <u>bona</u> <u>fide</u> findings.

The first question then is whether LDHH made findings in compliance with the Boren Amendment procedural requirements. If yes, then and only then will we need to inquire into the substantive adequacy and reasonableness of these reimbursement rates using the arbitrary and capricious standard of review. <u>Wilder</u>, 498 U.S. at 520 n.18; <u>Nebraska Health Care Assoc. v. Dunning</u>, 778 F.2d 1291, 1294 (8th Cir. 1985), <u>cert.</u> <u>denied</u>, 479 U.S. 1063 (1987). Even this standard and the presumption of

---

the Amendment gives the States substantial discretion in choosing among reasonable methods of calculating rates may affect the standard under which a court reviews whether the rates comply with the Amendment, but it does not render the Amendment unenforceable by a court." <u>Wilder</u>, 110 S. Ct. at 2523. <u>Wilder</u> did not decide what standard a court should use to review a state agency's actions under the Boren Amendment. The Court, however, did acknowledge that the Secretary has "limited oversight" over the plans. Also, in holding that § 1983 allows for private enforcement of the Boren Amendment, the Court rejected the petitioners' argument that Congress gave the Secretary, not the federal court, power to ensure that the rates are not based on false findings. <u>Id.</u> at 2520. The Court's decision in <u>Wilder</u> suggests that Congress intended federal courts to give deference to a state's reimbursement rate determinations unless the assurances submitted are based on patently false findings. The Hospitals here contend any other result would render LDHH's duty to make findings a mere formality, and LDHH's duty to make appropriate findings under the Boren Amendment was not intended by Congress to be a mere formality. <u>Id.</u> at 2520.

12

validity do not shield LDHH from a "thorough, probing, in-depth review" of the Medicaid plan.  Illinois Health Care, 983 F.2d at 1463 (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415 (1971) (reviewing under arbitrary and capricious standard the Secretary's approval of highway construction through park)).[11]

### LDHH'S FINDINGS

The Hospitals contend that LDHH never engaged in a findings process to substantiate its compliance with the Boren Amendment and its implementing regulations.  In their view, LDHH first erred by not adopting an objective profile of what constitutes an economically and efficiently operated hospital and, instead, arbitrarily defined an economic and efficient hospital as one whose costs do not exceed the assigned target rate.  Second, LDHH improperly relied on "subjective, generalized and unsupported assumptions about the general state of the economy in Louisiana" in deviating from the state Medicaid plan and imposing target

---

[11]The Hospitals also assign error to the district court's dismissal of the entire case, including the substantive issues on the reasonableness and adequacy of the reimbursement rates.  This Court agrees that there was error in dismissing the substantive claims.  The summary judgment motions pertained solely to the issue of procedural compliance with federal law.  While procedural noncompliance renders futile any attempted substantive compliance, procedural compliance does not guarantee compliance with substantive federal law.  See Mississippi Hosp. Assoc., Inc. v. Heckler, 701 F.2d 511 (5th Cir. 1983) (reviewing separately whether the state agency complied with the procedural requirements and whether the reimbursement rates were adequate in compliance with the substantive requirements of the Boren Amendment).

13

rate "freezes."  Third, LDHH violated federal law because it implemented and continued the rate freezes in 1989 and 1990, after HCFA disapproved the TN 88-12 proposed freeze, and because LDHH did not submit assurances to HCFA for the years 1989 and 1990.  LDHH responds that it made the appropriate findings and points to the affidavits of Carolyn O. Maggio (director of LDHH Bureau of Health Services Financing) and LDHH employee Helene Robinson (policy and program manager of Louisiana Medical Assistance Program).

Courts generally agree that a state can develop its own methodology for arriving at the required findings.  Amisub, 879 F.2d at 797; Illinois Health Care, 983 F.2d at 1464.  Regardless of the methodology, an agency still must make the required findings.[12]  What constitutes a Medicaid Act "finding" has been

---

[12]Federal regulations provide:

(b) *Findings*.  Whenever the Medicaid agency makes a change in its methods and standards, but not less often than annually, the agency must make the following findings:
(1) *Payment Rates*.  (i) The Medicaid agency pays for inpatient hospital services and long-term care facility services through the use of rates that are reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated providers to provide services in conformity with applicable State and Federal laws, regulations, and quality and safety standards.
(ii)  With respect to inpatient hospital services--
(A)  The methods and standards used to determine payment rates take into account the situation of hospitals which serve a disproportionate number of low income patients with special needs;
    . . . .
(C)  The payment rates are adequate to assure that

14

defined in different ways in the last decades.  Some opinions suggest that a finding simply consists of a "reasonably principled analysis."  <u>Folden</u>, 744 F. Supp. at 1532.  Others, ostensibly in the spirit of the Boren Amendment's flexible rate-setting scheme, pose that a finding is any showing of a "nexus" between reimbursement rates and efficiently and economically operated hospitals.  <u>Pinnacle Nursing Home</u>, 928 F.2d at 1314. The most detailed definition of a finding appears in <u>Amisub</u>.

> [T]he plain language of federal Medicaid law mandates the State Medicaid Agency, <u>at a minimum</u>, to make "findings" which identify and determine 1) efficiently and economically operated hospitals; 2) the costs that must be incurred by such hospitals; and 3) payment rates which are reasonable and adequate to meet the reasonable costs of the state's efficiently and economically operated hospitals.

<u>Amisub</u>, 879 F.2d at 796 (emphasis in original).

Whether a court chooses to require a "reasonably principled analysis" or a "nexus" or a profile of efficiently and economically operated hospitals is not crucial to determining compliance with the findings requirement.  All three of these cases adopt their own terminology to answer the same question. That is, what is the minimum quantum of evidence that an agency must possess in its cognition to substantiate its assurances that the reimbursement rates in the Medicaid plan and any proposed

---

> recipients have reasonable access, taking into account geographic location and reasonable travel time, to inpatient hospital services of adequate quality.

42 C.F.R. § 447.253(b) (1992).

amendments (1) reasonably and adequately meet the costs that must be incurred by efficiently and economically operated hospitals,[13] (2) accommodate hospitals serving a disproportionate number of low income patients with special needs, and (3) adequately ensure that Medicaid recipients have reasonable access to inpatient hospital services of adequate quality. 42 C.F.R. § 447.253(b)(1)(i), (ii)(A), (ii)(C) (1992).

The evidence clearly need not consist of the state agency's own comprehensive study of all state hospitals. In <u>Illinois Health Care</u>, the Seventh Circuit aptly observed that a sample of nursing homes as "paradigms of efficiency" may be impossible, waste money better spent on patients, and lead to more controversy. <u>Illinois Health Care</u>, 983 F.2d at 1464-65. On the other hand, the findings requirement is not a mere formality that can be satisfied simply by having a state officer think a bit about hospital costs and then copy out the statutory language on a piece of paper, put the heading "assurances" on that piece of paper, and send it to HCFA. <u>Wilder</u>, 110 S. Ct. at 2520; <u>Amisub</u>, 879 F.2d at 797; <u>see</u> <u>Pinnacle Nursing Home</u>, 928 F.2d at 1313-14 (procedural requirements are not "mere surplusage" but restrict the state's flexibility in formulating its reimbursement plan). The state agency must show it conducted an objective analysis,

_____

[13]Part and parcel of this requirement is that a state find that lower rates are imposed on hospitals providing inappropriate levels of care as mandated in 42 C.F.R. § 447.252(a)(3)(ii). <u>Mississippi Hosp. Assoc., Inc. v. Heckler</u>, 701 F.2d 511, 521-22 (5th Cir. 1983).

16

evaluation, or some type of factfinding process to determine the effects of the rates on the level of care Medicaid patients receive. Nebraska Health Care, 778 F.2d at 1294. As part of the factfinding process, the state agency must "judge the reasonableness of its rates against the objective benchmark of an 'efficiently and economically operated facility' providing care in compliance with federal and state standards while at the same time ensuring 'reasonable access' to eligible participants." Wilder, 496 U.S. at 519. This objective benchmark can be a "relative rather than an absolute concept." Illinois Health Care, 983 F.2d at 1467. It also can be implicit in a rate-setting methodology. Id.

LDHH admits, with some hesitation, that it conducted no studies and made no efforts to determine which state hospitals are efficiently and economically run. Instead, LDHH functioned under the premise that every hospital was economically and efficiently operated in 1981 and used the available cost reports for that base year to calculate the target rates for each hospital. Whether a particular hospital remains efficient and economical is gauged by whether the hospital stays within the designated target rate. Hospitals that exceed the designated target rate are deemed not efficient or economical and are not

17

reimbursed actual costs.  Rather, the hospitals receive the maximum payment determined by their respective target rates.[14]

---

[14]Helene Robinson is the policy and program manager of the Louisiana Medical Assistance Program primarily responsible for administering the Medicaid plan and assuring compliance with federal law.  Robinson's deposition on this point is worth an excerpt:

> Pizza [Counsel for the Hospitals]: Now what I'm trying to find out is, was any kind of study or analysis done to determine that hospitals that met or didn't meet their target rate were, in fact, either economic or not economic or efficient or not efficient?
> Robinson: Other than the deeming [of economic and efficient based on the target rate]--
> Pizza:    Yes.
> Robinson: --as a result of the State plan?
> Pizza:    Right.
> Robinson: I'm not aware of any.
> Pizza:    Now your answer is limited to '82, or is that for the whole period that you've been involved in the program?
> Robinson: We do ongoing analyses of adequacies of the rates.
> Pizza:    I understand that, but I'm talking about the previous question.  Has any study or analysis been done, to your knowledge, since you've been at the department concerning what you just answered?
>      . . . .
> Robinson: Analyses that hospitals were efficient and economic if they were within their target rate?
> Pizza:    Right.
> Robinson: We did those types of analyses.  I mean, if they were within their target rate, they were deemed efficient and economic, even though they might have had some continued inefficiencies.
> Pizza:    So then some analyses have been done at some time to determine which hospitals are, in fact, economically and efficiently operated?
> Robinson: They were deemed efficiently and economically operated if they were within--
> Pizza:    I'm still having a problem communicating then.  I think it's clear so far that up to some period of time no studies were done to determine whether or not hospitals which met or didn't meet their target rate were, in fact, economically and efficiently operated?

Clearly, the method by which LDHH promulgated the initial target rates fails the Boren Amendment test. LDHH did not make any finding that its plan complied with the three substantive requirements outlined in 42 C.F.R. § 447.253(b). Other than the cost reports, LDHH gathered no information and conducted no empirical analysis to ascertain whether the target rates "reasonably and adequately" compensated efficient and economical hospitals and hospitals servicing a disproportionate number of low income patients. "Federal law is not satisfied if a state merely makes conceptual policy decisions. A policy predicated upon provincialism and self-interest, not upon findings of reasonableness and adequacy, is unacceptable." West Virginia Univ. Hosps., Inc. v. Casey, 885 F.2d 11, 30 (3rd Cir. 1989).

LDHH insists that it engaged in "ongoing analyses of adequacies of the rates."[15] According to Robinson, in deciding

---

        Robinson: I don't know of any studies.
        Pizza:   Okay.  What I'm trying to find out, is
your answer limited to a particular year or does it
cover the whole period of time you've been working in
the Medicare program?
        Robinson: I guess it would cover about the whole
time.
        . . . .
        Pizza:    But would you say that if you don't know
of any such studies, then, in fact, there probably were
no studies?
        Robinson: To any knowledge, there aren't any.


[15]    LDHH argues that it considered numerous factors and
information prior to imposing rate freezes:

to freeze the target rates, she "looked at how costs had

_____

[1] Detailed operating and capital cost data for each hospital, including the extent to which individual hospitals recovered all or most of their operating costs[;]
[2] [t]he long-term and continuing decline in hospital occupancy rates[;]
[3] [h]ospital staffing levels[;]
[4] [n]umbers of licensed hospital beds[;]
[5] [t]he relatively few complaints regarding hospital quality of care, and information regarding hospital quality of care and information about certification of facilities[;]
[6] [i]nformation concerning continued expansion of hospital facilities[;]
[7] [i]nformation concerning entry and exit from the Medicaid program by inpatient hospitals[;]
[8] [t]he availability of an administrative process for reviewing and adjusting upwards the target rates of individual hospitals[;]
[9] [t]he State Plan's many generous features such as (i) 100 percent reimbursement of capital costs, malpractice and education expenses (ii) no cap on costs included in a facility's base year "target rate" calculation regardless of whether or not efficient; and (iii) generous per diem reimbursement of certain specialized care units, including neo-natal, burn, psychiatric and drug abuse units[;]
[10] [d]ata regarding employment, income and other economic trends nationally, in the Gulf Region, and in Louisiana, including information regarding the relatively depressed character of Louisiana's economy[; and]
[11] [t]he need for cost containment incentives.

(Appellee's Brief at 23-24 (record cites omitted).) LDHH cites only to Helene Robinson's affidavit as proof that it considered these factors. In determining whether LDHH complied with the procedural requirements of the Boren Amendment, this Court is not concerned with the adequacy of these alleged "findings" but with LDHH's fact-gathering procedures. Helene Robinson's affidavit indicates that she limited her review to the hospital's audited cost reports and data "gathered from other agencies and the media" on the general state of the economy in Louisiana (i.e., recession and high unemployment rate) as compared to the nation. Robinson's deposition testimony clarifies exactly what efforts she made on behalf of LDHH to satisfy the findings requirement.

20

increased from the base period to the current audited period versus how the average target rate had increased in that same period of time.  And that the increases in the target rate were greater than the actual increases in costs."  The "costs" compared were the hospitals' total cost per discharge, without any separation of labor costs or other cost components.  Robinson retrieved this cost data from audited cost reports available for the latest time period.  There were hospitals whose data was not considered.  She did not employ a random statistical sampling or scientific methodology to determine that the hospitals reviewed were representative.  Rather, Robinson admits in her deposition that she didn't do an actual analysis but based the "process" on what she thought was right based on her experience.  Robinson further says that no analysis was done to determine if the uncounted hospitals skewed the results until 1987 or 1988.

Robinson says she reviewed other data available from the "Department of Labor and Statistics" and other publications reflecting general economic conditions.  Robinson recalls in deposition she "had difficulty obtaining data on Louisiana-specific" information.  She did manage to review "like weekly things in the newspaper. . . . things in magazines and so on regarding, you know, unemployment, drops in personal income, and so on for the State."  However, this analyses could not be reproduced because it was an "ongoing process" not reduced "necessarily [to] a written bound copy of something."

21

Furthermore, Robinson neither recommended to her staff nor initiated any efforts to obtain information regarding the economic conditions in the State as they affect hospitals, hospital labor costs, or any other costs that would be reflected in the hospital cost reports.  Nor did Robinson recall having access to or using any studies or data base concerning such economic conditions and cost of care, or medical care, throughout the State.  Finally, Robinson did not investigate the effects of case mix changes on Louisiana providers, such as increased outpatient services and longer hospital stays for inpatient services.  What she says is this:

> Pizza:     [W]as any study done by DHH during the period 1982 through 1989 to determine whether or not those factors influenced inflation for hospitals in Louisiana? [Those factors enumerated were the "increase in the hiring of RNs as opposed to LPNs, the increasing complexity of patient treatments, the trend of treating more outpatients [,] . . . that wage rates for hospital employees had climbed higher than for other kinds of employees, and finally that insurance costs had climbed at a higher rate for hospitals than it had for other industries nationwide."]
> Robinson: Studies were done in regard to hospital cost increases that would have reflected some of those factors.
> Pizza:     I know, but was a study done, though, looking at those factors themselves and their effect on hospitals in Louisiana, germane just to those factors?
> Robinson: We look at the factors in the aggregate.
> Pizza:     So your answer then is no particular study was done to look at those individual factors; is that right?
> Robinson: As I stated, we look at the factors and the increases in costs in the aggregate.
> Pizza:     Okay.  Now when you say you looked at them in the aggregate, what did you do to look at them in the aggregate?
> Robinson: We review cost data--
> Pizza:     Cost reports?
> Robinson: --from the cost reports.

22

          Pizza:    So you examine cost reports to see how that data affected hospitals; is that right?
          Robinson: We examine cost data to review--to determine the adequacy of the rates.

LDHH's purported "ongoing analysis" suffers from the same faulty logic as its initial rate-setting scheme.  Findings were not made, instead assumptions were made.  It is circular for LDHH to set target rates under the assumption that all hospitals are efficiently and economically operated and then identify efficiently and economically operated facilities as those whose costs fall below their own reimbursement rate.  Under these circumstances, a hospital's ability to keep costs below the target rate is not a reflection of its efficiency or economy of operations.  Even Robinson admits this fallacy in LDHH's rate-setting methodology.  She testified at her deposition that "if [the hospitals] were within their target rate, they were deemed efficient and economic, even though they might have had some continued inefficiencies."  She also acknowledges in her affidavit that each hospital's target rate initially included all allowable base year costs, without "limit[] or cap[] in any respect to remove inefficient, uneconomic or unnecessary costs."  By enacting the Boren Amendment, Congress intended states to abandon such "reasonable cost" schemes that paid actual hospital costs, despite obvious disparities in efficiencies and economies, in favor of reimbursement systems that encourage hospital efficiency and cost containment.  H.R. Rep. No. 158, 97th Cong.,

23

1st Sess. 293 (1981)[16]; <u>Temple University v. White</u>, 941 F.2d 201, 207 (3rd Cir. 1991); <u>West Virginia Univ. Hosp.</u>, 885 F.2d at 23.

LDHH has reduced its findings process to a simple exercise of compilation and assumption, completely ignoring the Congressional mandate that state agencies consider relevant factors such as efficiency, economy, quality of care, and reasonable access. LDHH emphasizes that it has received relatively few complaints regarding hospital quality of care. This fact, however, says nothing about the reasonableness or adequacy of rates to meet the needs of efficiently and economically operated hospitals where rates initially set assume that every hospital is efficient and economic. At most, LDHH's "findings" process consisted of reviewing general information regarding the state of the economy and the available cost reports. LDHH can point to nothing in the federal Medicaid scheme that permits it to use the general state of the economy as

---

[16]The House of Representatives Report states in pertinent part:

> In eliminating the current requirement that States pay hospitals on a Medicare "reasonable cost" basis for inpatient services under Medicaid, the Committee recognizes the inflationary nature of the current cost reimbursement system and intends to give States greater latitude in developing and implementing alternative reimbursement methodologies that **promote the efficient and economical delivery of such services.**

H.R. Rep. No. 158, 97th Cong., 1st Sess. 293 (1981) (emphasis added).

the sole justification for setting rates.[17]  Nor is there anything that condones a findings procedure that employs only historical cost data and projected inflation figures.  To the contrary, courts have condemned similar schemes.

In Amisub, the state Medicaid agency presented as evidence of its "findings" process only a "consistency between the current expenditure for Medicaid provider reimbursement and the amount of money historically appropriated by the Colorado legislature, and HCFA's acceptance of the previous Colorado Medicaid Plan." Amisub, 879 F.2d at 796.  The Tenth Circuit rejected this evidence as proof of "findings" for three reasons.  First, the state agency's reliance on HCFA's approval of a previous plan belies the statutory requirement that agency's make at least annual findings.  Id. at 797.  Second, there is nothing in the Medicaid Act from which to infer that an agency may rely solely on the "historical trends concept" that the new plan is adequate because the monetary appropriations are identical to the old plan.  Id. at 797, 799.  Finally, a "record is blatantly devoid

_____

[17]In Illinois Health Care v. Bradley, 983 F.2d 1460 (7th Cir. 1993), the Seventh Circuit affirmed the district court's declaratory judgment invalidating Illinois's Medicaid plan for failure to make proper findings.  The rates allegedly were premised on time and motion studies conducted in the early 1980's in other states.  Id. at 1466.  Skeptical that the unproduced studies ever existed, the court found that the plan did not implicitly identify the economic and efficient nursing homes in Illinois and, thus, did not comply with the Boren Amendment's procedural requirements.  Id. at 1467.  The court also determined that a finding that a rate is adequate and reasonable merely because a number of nursing homes are profitable does not constitute a "finding" in compliance with the Amendment.  Id.

25

of any effort . . . to make the federally mandated findings" where the assurances are based solely on budgetary constraints. <u>Id.</u> at 800. The Tenth Circuit ultimately remanded the case and ordered the state agency "to comply with the procedural and substantive requirements of the federal Medicaid Act and its implementing regulations, and to engage in a <u>bona</u> <u>fide</u> findings process before submitting any new plan and/or assurances to HCFA." <u>Id.</u> at 801.[18] We too remand this case and order LDHH to engage in a <u>bona</u> <u>fide</u> findings process.

LDHH likens its case to that in <u>Mississippi Hosp. Assoc., Inc. v. Heckler</u>, 701 F.2d 511 (5th Cir. 1983), where we affirmed summary judgment declaring that Mississippi's Medicaid agency complied with the federal procedural requirements. <u>Mississippi Hosp.</u>, however, is inapposite for two reasons. First, in <u>Mississippi Hosp.</u>, we did not review whether the state agency engaged in a <u>bona</u> <u>fide</u> findings process. Rather, Mississippi's

_____

[18]In <u>Temple University v. White</u>, 941 F.2d 201 (3rd Cir. 1991), the court invalidated the Medicaid plan for failure to make "critical and required findings." The state agency's review of its rate scheme was confined to internally-generated reports identifying hospitals with reported costs above and below the group rates and to some revenue projections. <u>Id.</u> at 210. The agency also noted that it received no complaints from Medicaid recipients regarding their ability to obtain care. <u>Id.</u> Both the district and appellate courts concluded that the state agency "made no findings as to the reasonableness or adequacy of its rates to cover costs of an efficiently and economically operated hospital or to account for the impact on a hospital of its across-the-board budget neutrality adjustment and varying percentage add-ons for disproportionate-share hospitals. . . . [or to ensure] reasonable access to inpatient hospital care." <u>Id.</u>

26

Medicaid agency was accused of not complying with federal procedural requirements based on its failure to consult with the Medical Care Advisory Committee, its publication of an allegedly inadequate public notice, and its failure to submit proper assurances.  Id. at 520.  It is evident from our discussion that Mississippi engaged in a bona fide findings process and that we confined our review to the sufficiency of these findings under the arbitrary and capricious standard.  Id. at 516-18.  We have not reached this second stage of analysis in this case.

Second, we find no similarities between the findings processes adopted by LDHH and those adopted by Mississippi's agency.  Mississippi based its rate ceiling on two-years and over 300 hours of "careful and objective studies of cost data filed by Mississippi hospitals . . .[,] methods used by other states and the federal government. . . .[,] an incredible rage of cost incurred by hospitals," and statewide occupancy rates.  Id. at 517, 520.  Here, Robinson's review of cost reports was limited to comparing the available aggregate costs to the hospital's target rate to determine reimbursement.

This Court cannot endorse such a pro forma compliance with the findings requirement of the Boren Amendment.  LDHH's inability to articulate an orderly process of evaluation or to identify specific documents reviewed renders suspect its "findings" and renders meritless its argument that it engaged in a bona fide findings process.  Because we find that LDHH, as a

matter of law, failed to comply in practice with the Boren Amendment findings requirement, this Court REVERSES the district court's grant of LDHH's summary judgment motion and denial of the Hospitals' summary judgment motion. This case is REMANDED for proceedings not inconsistent with this opinion.