ROBERTSON, Judge.
 

 The defendants below, the Indiana State Board of Public Welfare; the Indiana Department of Public Welfare; and, Suzanne Magnant, in her capacity as the Administrator of the Indiana Department of Public Welfare (hereinafter collectively referred to as the State) bring this interlocutory appeal pursuant to Ind.Appellate Rule 4(B)(3) to challenge the entry of a preliminary injunction, and the denial of the State’s motion to dissolve the injunction, in this class action brought by both for-profit and not-for-profit intermediate and skilled nursing facilities, intermediate care facilities for the mentally retarded and community residential facilities for the developmentally disabled in the State of Indiana. The injunction prohibits the State from implementing certain proposed changes to its Medicaid reimbursement rate methodology, which the State initially promulgated as 470 I.A.C. 5-4.2 (now 405 I.A.C. 1-4). We affirm.
 

 The class brought this action in January of 1990 under 42 U.S.C. § 1983 and the Indiana Uniform Declaratory Judgment Act, Ind. Code 34-4-10, alleging that the State’s reimbursement scheme in effect since 1983, 470 I.A.C. 5-4.1 (4.1), did not conform with federal or state statutory requirements, either procedurally or substantively. The Hancock County Circuit Court preliminarily enjoined the State from employing 4.1 on May 29, 1990, and on June 18, 1990, entered an order which required the State to make monthly deposits into an escrow account. The fourth district of this court vacated the May 29, 1990, preliminary injunction and the June 18, 1990, escrow order on July 22, 1991 in
 
 Indiana State Board of Public Welfare v. Tioga Pines Living Center, Inc.
 
 (1991), Ind. App., 575 N.E.2d 303,
 
 trans. denied. (Tioga I).
 

 On February 26,1991, after the trial of the class’ initial allegations had begun but had not yet been completed, the State adopted the proposed rules (4.2) which are the subject of this appeal. The class moved to supplement its complaint to incorporate a challenge to this new reimbursement scheme and obtained the preliminary injunction which we now review. The injunction reinstated the requirement that the State make monthly deposits into escrow as required under the first preliminary injunction. On May 27, 1994, at the oral argument on the merits of the injunction contested in this appeal, counsel for the class stipulated that that portion of the trial court’s order which required the State to pay certain amounts into escrow was no longer valid. Upon agreement of the parties, we vacated the escrow component of the Hancock Circuit Court’s order of May 14, 1991 as modified on July 8, 1991 by separate order dated June 7, 1994, effective July 1, 1994.
 

 The trial court entered a general judgment with “advisory findings” on the merits of the litigation relating to 4.1 in September, 1991, in favor of the class. The judgment became final on March 25, 1992. This court consolidated the judgment on the amended complaint challenging 4.1 with the
 
 Community Care Centers, Inc. v. Indiana State Board of Public Welfare
 
 case, and deferred ruling upon either the class’ challenge to 4.2 or the merits of the State’s appeal in the
 
 Indiana State Department of Public Welfare v. Lifelines of Indianapolis Limited Partnership
 
 (1994), Ind.App., 637 N.E.2d 1349, which too involved a substantive challenge to the State’s rate-setting methodology, until the
 
 *1307
 
 Indiana Supreme Court had had an opportunity to review the judgments on 4.1. The Indiana Supreme Court took jurisdiction of the State’s consolidated appeal of the judgments against it on 4.1 pursuant to Ind.Appellate Rule 4(A)(10), (now App.R. 4(A)(9)), and reversed the judgment in favor of the
 
 Tioga Pines
 
 class on October 29, 1993. See
 
 Indiana State Board of Public Welfare v. Tioga Pines Living Center
 
 (1998), Ind., 622 N.E.2d 935,
 
 cert. denied,
 
 —U.S.-, 114 S.Ct. 1302, 127 L.Ed.2d 654.
 
 (Tioga II).
 
 Having obtained the guidance of this state’s highest court with respect to the common question of law in the
 
 Tioga Pines
 
 and
 
 Lifelines
 
 cases, we now report our decisions in separate opinions.
 

 Standard of Review
 

 [The] grant or denial of a preliminary injunction lies within the sound discretion of the trial court.
 
 College Life Insurance Co. of America v. Austin
 
 (1984), Ind.App., 466 N.E.2d 738, 741 [hereinafter referred to as
 
 College Life]; Wells v. Auberry
 
 (1982), Ind.App., 429 N.E.2d 679, 682. We will not interfere with the exercise of that discretion unless it is shown that the trial court’s action was arbitrary or constituted a clear abuse of discretion.
 
 College Life,
 
 at 741;
 
 Wells,
 
 at 682. In reviewing the trial court’s action, we will not weigh conflicting evidence, but will consider only that evidence supporting the trial court’s findings, conclusions and order.
 
 College Life,
 
 at 744;
 
 Wells,
 
 at 682....
 

 When determining whether the trial court abused its discretion, we review the trial court’s findings of fact. ‘Whether such findings of fact are adequate depends upon whether they are sufficient to disclose a valid basis under the issues for the legal result reached in the judgment and whether they are supported by evidence of probative value. Such findings may not be set aside unless they are clearly erroneous.”
 
 College Life,
 
 at 742.
 

 Ridenour v. Furness
 
 (1987), Ind.App., 504 N.E.2d 336, 339,
 
 adopted in part,
 
 Ind., 514 N.E.2d 273.
 

 The discretion to grant or deny preliminary relief is ordinarily measured by several factors, among them, whether the .plaintiffs remedies at law are inadequate, thus causing irreparable harm pending resolution of the substantive action if the injunction does not issue; whether the plaintiff has demonstrated at least a reasonable likelihood of success at trial by establishing a prima facie case; whether the threatened injury to the plaintiff outweighs the threatened harm the grant of the injunction would occasion upon the defendant; and whether, by the grant of a preliminary injunction, the public interest would be disserved.
 
 Id.; Steenhoven v. College Life Ins. Co. of America
 
 (1984), Ind.App. 458 N.E.2d 661, 664. As this court observed in
 
 Wells v. Auberry
 
 (1982), Ind.App., 429 N.E.2d 679, 683, when these factors are applied over several cases, certain patterns emerge. Where there is a great danger of irreparable harm to the petitioner or the public, there is less of a need to go beyond the establishment of a prima facie case on the merits. Conversely, as the imminence of irreparable harm is reduced, the prima facie case requirement expands to the test of probability of recovery on the merits.
 
 Id.
 
 at 683.
 

 Likelihood of Success on the Merits
 

 Medicaid is a voluntary, cooperative program designed by Congress to enable participating states to obtain federal financial assistance in earing for the medical needs of the states’ needy. To qualify for this assistance, a state must devise a scheme for reimbursing health care providers and have that plan approved by the Secretary of Health & Human Services. The state plan must comply with Section 1902(a)(13) of the Medicaid Act, 42 U.S.C. § 1396a(a)(13)(A) as amended by the Omnibus Reconciliation Act of 1980, Pub.L. 96-499 § 962(a), 94 Stat. 2650 (1980), the revision now commonly referred to as the Boren Amendment.
 

 The Boren Amendment requires that a state plan provide
 

 for payment ... of ... nursing facility services, and services in an intermediate care facility for the mentally retarded provided under the plan through the use of
 
 *1308
 
 rates ... which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards ...
 

 42 U.S.C. § l^eataXlSXA).
 
 [1]
 
 Neither the Act nor the administrative regulations which implement it define “reasonable and adequate” or an “efficiently and economically operated” facility; nor do they require the state to expressly define these terms in its plan.
 
 [2]
 
 Indeed, it was Congress’ intent to give the states considerable latitude in meeting this standard, subject to the requirement that the state “find” its rates meet the substantive standard, and to review by the Secretary of the reasonableness of each state’s assurances that its rates are “reasonable and adequate” to meet the costs of “efficiently and economically operated facilities.”
 
 Wilder v. Virginia Hospital Association
 
 (1990), 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455. Hence, the Boren Amendment creates both a procedural and substantive right, enforceable in a private cause of action pursuant to § 1983, to have the state adopt rates that it finds are reasonable and adequate to meet the costs of an efficient and economical health care provider.
 
 Id.
 
 at 513, 524, 110 S.Ct. at 2519, 2525.
 

 The federal statute explicitly requires findings and assurances by the participating state that its methods and standards result in reasonable and adequate payment rates, and it requires that those findings be correct.
 
 Id.
 
 at 514, 110 S.Ct. at 2519. The requirement that the state make “findings” is thus not a mere formality, but an entirely independent, necessary prerequisite to the requirement of assurances.
 
 Id.
 
 at 514, 110 S.Ct. at 2519. Compliance is mandatory.
 
 Id.
 
 at 512, 110 S.Ct. at 2518. Before assurances can be made, the state must engage in a findings process.
 
 Illinois Health Care Ass’n v. Bradley
 
 (7th Cir.1993), 983 F.2d
 
 *1309
 
 1460, 1462;
 
 Pinnacle Nursing Home v. Axelrod
 
 (2nd Cir.1991), 928 F.2d 1306, 1313.
 

 In making its findings, the state must judge the reasonableness of its rates against the objective benchmark of an “efficiently and economically operated facility” providing care in compliance with federal and state standards while at the same time assuring “reasonable access” to eligible participants.
 
 Wilder,
 
 496 U.S. at 519, 110 S.Ct. at 2522. However, this process of evaluation need not take any particular form.'
 
 Illinois Health Care Ass’n,
 
 983 F.2d at 1465. The state must determine in its own way what it would consider to be efficient and economical nursing facilities and must make findings which establish a nexus with the federal standard.
 
 Id.
 
 The state agency must show it conducted an objective analysis, evaluation, or some type of fact-finding process to determine the effect of rates on the level of care Medicaid patients receive.
 
 Abbeville General Hospital v. Ramsey
 
 (5th Cir.1993), 3 F.3d 797, 805,
 
 cert. denied,
 
 —U.S.-, 114 S.Ct. 1542, 128 L.Ed.2d 194. The Boren Amendment is not satisfied if the state merely engages in conceptual policy decision-making.
 
 West Virginia University Hospital, Inc. v. Casey
 
 (3rd Cir.1989), 885 F.2d 11,
 
 affirmed,
 
 494 U.S. 1003, 110 S.Ct. 1294, 108 L.Ed.2d 472 (on attorney fee question).
 
 See also Amisub v. Colorado
 
 (10th Cir.1989), 879 F.2d 789, 797,
 
 cert. denied,
 
 496 U.S. 935, 110 S.Ct. 3212, 110 L.Ed.2d 660 (Stating three criteria of findings process to be identification and determination of an efficient and economically operated hospital; costs that must be incurred by such a hospital; and, the payment rates which are reasonable and adequate to meet costs that must be incurred by an efficient and economically operated hospital).
 

 The question of whether a state has complied with the procedural requirements of the Boren Amendment is a matter of law, subject to de novo review by the courts.
 
 Abbeville General Hospital,
 
 3 F.3d at 802;
 
 Pinnacle Nursing Home,
 
 928 F.2d at 1314;
 
 Amisub,
 
 879 F.2d at 795. The question for determination is essentially whether the agency has demonstrated that it possesses in its cognition a sufficient quantum of evidence to substantiate its assurances that it “pays for ... long-term care facility services through the use of rates that are reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated providers to provide services in conformity with applicable State and Federal laws, regulations, and quality and safety standards.”
 
 Abbeville General Hospital,
 
 3 F.3d at 805; 42 C.F.R. § 447.253(b)(1).
 

 Inherent in the trial court’s factual finding # 15,
 
 [3]
 
 which contains the legal conclusion that the defendants failed to make an appropriate finding as required by federal law, is the factual determination that the State failed to consider whether its proposed rates meet the objective benchmark identified in
 
 Wilder.
 
 Our review of the record convinces us that this factual determination is not clearly erroneous.
 

 The State’s witness, Keenan Buoy, an employee of the State’s rate contractor, Myers & Stauffer, testified that Myers & Stauffer performed a number of studies relating to the proposed changes in reimbursement methodology. These studies “primarily had to do with pro forma calculations under the new criteria parameters,” including some cost to rate comparisons, “comparisons of different parameters,” “old versus new.”
 
 *1310
 
 The rate-setter’s data and analysis establish that 80% of the facilities evaluated would have prospective costs or budgeted allowable costs that are less than their prospective reimbursement rate under the new criteria while 20% would have prospective budgeted allowable costs that are greater than their prospective rate under the new criteria. Data available in December, 1990 also permitted the State’s contractor to predict that 82.89% of the facilities evaluated will receive 85% of their inflated costs, that is, historical costs per patient per day (excluding excess owner, related party management compensation and building depreciation) inflated by the HCFA index.
 

 Presumably, the studies to which Buoy referred constitute the extent of the State’s empirical analysis of its reimbursement system. We must agree with the trial court that these studies fall short of the mark set by the federal cases. First, as the State’s contractor openly acknowledged, the State excluded from its data base better than half of the 744 providers in the class, either because historical cost data had not yet been reported for some of them or because historically these providers had had an occupancy rate of less than 80%. At best then, the State’s “studies” were designed to predict the extent of reimbursement which would be received by only 48% of the class; they do not purport to show the reasonableness and adequacy of the State’s rates as a whole or even of a representative sample. The use of the 80% occupancy factor is itself not explained.
 

 But, more importantly, neither the extent of reimbursement of inflated historical cost nor the comparison of projected rate to
 
 budgeted allowable costs,
 
 a figure obtained by the State
 
 after
 
 various actual costs have been disallowed, supplies the mandatory objective assessment of quality of care and reasonable access required by the Boren Amendment. If the State’s reimbursement system defines an efficient and economically operated facility, the costs disallowed must be costs which, in the State’s view, an efficient and economical facility need not incur to provide care in compliance with federal and state standards. But, as the trial court recognized, there is nothing in the record which demonstrates that the State analyzed its system to ascertain that there was in fact a nexus between what the State has determined as a matter of policy or self-interest are allowable costs or costs which efficient and economically operated facilities must incur and what the Boren Amendment refers to as costs which must be incurred by efficient and economically operated facilities
 
 to provide the level of care required by federal and state standards.
 

 [4]
 

 In the words of the fifth circuit, “nothing in the federal Medicaid scheme ... permits [a state agency] to use the general state of the economy as the sole justification for setting rates. Nor is there anything that condones a findings procedure that employs only historical cost data and projected inflation figures.”
 
 Abbeville General Hospital,
 
 8 F.3d at 808-9. “ A record is blatantly devoid of any effort ... to make the federally mandated findings’, where the assurances are based solely on budgetary constraints.”
 
 Id.
 
 at 809 (quoting
 
 Amisub,
 
 879 F.2d at 800). Hence, we must agree with the trial court’s legal conclusion on the facts in this record that the State did not engage in a bona fide findings process.
 

 The federal regulations which implement the Boren Amendment require a finding by a state “whenever the state makes a change in its methods and standards,” but at least annually. 42 C.F.R. § 447.253(b). A state need submit
 
 assurances
 
 to that effect however only when it makes a change in its reimbursement rates. 42 C.F.R. § 447.253(a).
 

 The State argues that it had no obligation to make findings before 4.2 went into effect. While it is true that the regulations permit the implementation of a change while a state
 
 *1311
 
 is awaiting approval,
 
 Colorado Health Care Ass’n v. Colorado Dept. of Social Services
 
 (10th Cir.1988), 842 F.2d 1158, 1167;
 
 Wisconsin Hospital Ass’n v. Reivitz
 
 (7th Cir.1984), 733 F.2d 1226, 1236, a state plan amendment that is approved “will become effective not earlier than the first day of the calendar quarter in which an approvable amendment is submitted ...” 42 C.F.R. § 447.256(c). Therefore, if the State intended its regulations to become effective on April 1, 1991, it needed to make its finding on 4.2 and submit its assurances no later than the end of the calendar quarter or June 30,1991. See
 
 Colorado Health Care Ass’n,
 
 842 F.2d at 1167.
 

 At a minimum, the implementing regulations require the State to engage in a findings process annually. The trial court indicated in its advisory findings which were a part of its judgment on the merits of 4.1 that the State had not complied with the Boren Amendment’s annual findings requirement. The Indiana Supreme Court did not review this determination, and the State does not now argue that it was wrong, or otherwise show it to be clearly erroneous. The trial court preliminarily enjoined the implementation of 4.2 on May 14, 1991, only three months after it had tried the class’ complaint on 4.1. There was no new evidence of bona fide compliance with the annual requirement and we have held that the process in conjunction with the proposed change was not bona fide. On June 11, 1991, the State moved to dissolve the preliminary injunction on the ground that its most recent data showed the nursing homes, “on the average and in the aggregate” would receive higher rates under 4.2 than they were receiving under 4.1. At that time, the State did not make any showing that it had made or could bring forth any additional studies or evidence establishing that it had engaged in an objective evaluation of its reimbursement scheme. On July 23, 1991, the State sought again to have the preliminary injunction vacated, this time on the ground that this court’s decision in
 
 Tioga I
 
 compelled the injunction to be dissolved. The court denied that motion on September 6, 1991, the State appealed, and its appeal became part of this cause. In July, 1991, the State again offered no evidence that it had in fact engaged in a bona fide findings process and made assurances by June 30, 1991.
 

 The trial court could properly consider the record of the entire cause in ruling upon the class’ motion for preliminary injunction,
 
 Cunningham v. Hiles
 
 (1982), Ind. App., 439 N.E.2d 669, 676,
 
 trans. denied,
 
 and in particular, in evaluating the reasonable likelihood of the class’ success on the merits of its procedural claim, as can we.
 
 Indianapolis Dairymen’s Co-op v. Bottema
 
 (1948), 226 Ind. 260, 261, 79 N.E.2d 409, 410. From a historical perspective, it appeared unlikely that the State would comply with the procedural requirement without being motivated by the threat of a court order. We agree with the trial court’s conclusion that the class’ has demonstrated a reasonable likelihood of success on the merits of its procedural claim.
 

 Adequacy of Remedy at Law and Irreparable Harm
 

 Traditionally, a preliminary injunction is used to preserve the existing state of affairs so that the court can ultimately render a meaningful decision on the merits.
 
 Wells,
 
 429 N.E.2d at 683. Use of the remedy is therefore necessary only when harm to the movant is likely to occur before trial and the harm threatened would impair the court’s ability to grant an effective remedy. The harm is said to be irreparable because it is of a type which the court will not be able to remedy following a final determination on the merits.
 
 Id. See also,
 
 11 Wright and Miller, Federal Practice and Procedure § 2948, p. 434 (1973). Adequate compensation or other corrective relief, available at a later date, weighs heavily against a claim of irreparable harm.
 
 Tioga I,
 
 575 N.E.2d 303 (quoting from
 
 Indiana State Department of Welfare v. Stagner,
 
 (1980), Ind.App., 410 N.E.2d 1348 at. 1352-53).
 

 However, the mere existence of a remedy at law is not sufficient to preclude the issuance of a preliminary injunction. The legal remedy must be plain and adequate, and as prompt in administration, as is the remedy in equity.
 
 Sandage v. Studabaker Brothers Manufacturing Co.
 
 (1895), 142 Ind. 148, 154, 41 N.E. 380. It must be as
 
 *1312
 
 practical and efficient to the ends of justice.
 
 Denny v. Denny
 
 (1887), 113 Ind. 22, 26, 14 N.E. 693.
 

 In
 
 Tioga I,
 
 the fourth district of this court concluded that, at best, the trial court’s findings showed only monetary damage would occur to the class before a final judgment could be entered on the merits of the class’ challenge to the existing Medicaid reimbursement system and that economic injury alone did not warrant the granting of a preliminary injunction, there being an adequate remedy at law for damages available to the injured class should it be determined that the class was being under-reimbursed. 575 N.E.2d at 306-7. The result in Tioga I is consistent with the general rule in Indiana that threatened business failure is not the sort of irreparable injury against which equity protects.
 
 Stagner,
 
 410 N.E.2d at 1352.
 
 But cf., Illinois Hospital Ass’n v. Illinois Dept. of Public Aid
 
 (N.D.Ill., 1983), 576 F.Supp. 360 (provider’s inability to stay in business constitutes irreparable harm).
 

 The State argues that the fourth district’s opinion in
 
 Tioga I
 
 constitutes the law of the case on the element of irreparable harm. The doctrine of the law of the case provides that a decision rendered on appeal upon a given state of facts or principle of law becomes the law of the case applicable to such facts or principle throughout all stages of the litigation.
 
 Fair Share Organization, Inc. v. Mitnick
 
 (1964), 245 Ind. 324, 327, 198 N.E.2d 765. However, the rule, being one which tends to prevent the judicial consideration of a particular controversy, is not to be extended beyond the exigencies which demand its application.
 
 Egbert v. Egbert
 
 (1956), 235 Ind. 405, 414, 132 N.E.2d 910. If a cause is remanded and the parties have a right to introduce new evidence and establish a new state of facts, the decision of the court on appeal ceases to be the law of the case and the court in the trial of the cause is not conclusively bound by such decision but should apply the law applicable to the new and changed state of facts.
 
 Id.
 
 at 416, 132 N.E.2d 910 (citing
 
 Dodge v. Gaylord
 
 (1876), 53 Ind. 365).
 

 The trial court’s findings relevant to the issue of irreparable harm in the instant case are contained primarily in paragraph 30.
 
 [5]
 
 The trial court specifically found that the new regulations significantly threatened the public’s interest in the quality of care required by federal and state law. In
 
 Tioga I,
 
 the trial court found the plaintiffs had no adequate remedy at law and the class stood to be irreparably harmed; the court did not address the potential harm to the public interest in its findings in
 
 Tioga I.
 

 [6]
 

 Moreover, it is important to keep in mind the procedural posture of this case. The class obtained the preliminary injunction
 
 *1313
 
 now appealed almost a year after the first injunction considered by the fourth district. The parties offered and relied upon evidence in addition to that presented at the hearing on the first injunction, and, of course, had already tried the class’ claims with respect to 4.1. The trial court therefore had before it a new state of facts which, as we discuss below, show a potential harm to the public interest. We perceive this to be a significant enough difference to caution against a mechanical application of
 
 Tioga I.
 

 The harm threatened in the State’s failure to comply with the procedural mandate of federal law is readily discernible from the federal Act itself. If the plan is permitted to be put in place without procedural compliance and is ultimately invalidated on that basis, a scenario which we agree is reasonably likely given the State’s history of noneompliance, the State stands to lose its federal funding. Provision of federal funds is expressly conditioned on compliance with the amendment and the Secretary is authorized to withhold funds for noneompliance with this provision.
 
 Wilder,
 
 496 U.S. at 512, 110 S.Ct. at 2518 (citing 42 U.S.C. § 1396c (1982 ed.)). The Secretary has expressed his intention to withhold funds if the State plan does not comply with the statute or if there is “noncompliance in practice.”
 
 [7]
 

 Wilder,
 
 496 U.S. at 512, 110 S.Ct. at 2518.
 

 Moreover, had the trial court permitted the plan to become effective, it would then necessarily be forced to use its equitable powers to fashion an interim remedy until procedural and possibly substantive compliance is achieved, for no reimbursement plan would be in effect, 4.2 having repealed 4.1. At this point, harm to the class and the public from the State’s noncompliance can be most effectively remedied with the continuation of the injunction. A remedy which prevents a threatened wrong is in its essential nature better than a remedy which permits the wrong to be done, and then attempts to pay for it by pecuniary damages.
 
 Xenia Real-Estate Co. v. Macy
 
 (1897), 147 Ind. 568, 573, 47 N.E. 147. We agree with the trial court that the class has shown that it has no adequate remedy at law and that equitable relief is warranted.
 

 Balance of the Hardships a'nd the Public Interest
 

 Because the public’s interests are threatened, the balance of equities does not merely require the trial court to determine whether the threatened injury to the class outweighs the threatened harm the grant of the injunction would occasion upon the State. In the balance, the court also must determine whether the public interest would be dis-served if the injunction were to issue. When the acts sought to be enjoined clearly are against the public interest, the plaintiff need show neither irreparable injury nor a balance of hardship in its favor.
 
 Rees v. Panhandle Eastern Pipe Line Co.
 
 (1978), 176 Ind.App. 597, 377 N.E.2d 640, 649 (quoting 11 Wright and Miller, Federal Practice and Procedure § 2948, p. 461 (1963)).
 

 Insofar as the injunction prohibits the State from continuing to violate federal and state law, the injunction imposes no burden upon the State whatsoever. It is, after all, the Boren Amendment which imposes the burden, and then only upon those states which elect to participate in the Medicaid program.
 
 Thomas v. Johnston
 
 (W.D.Tx., 1983), 557 F.Supp. 879, 919.
 
 Cf. also, Haskins v. Stanton
 
 (7th Cir.1986), 794 F.2d 1273, 1277. The State has not shown that it will suffer any other particular injury by being required to continue its rate of reimbursement at the 4.1 rate level.
 

 Moreover, there can be no disservice to the public in enforcing a statute designed to promote the public welfare as this one is.
 
 Illinois Hospital Ass’n,
 
 576 F.Supp. at 372. As aptly stated by the court in
 
 Thomas,
 
 557 F.Supp. at 919:
 

 
 *1314
 
 It is contrary to federal policy for states to make arbitrary reductions in reimbursement rates that have an adverse effect on the quality of care of Medicaid recipients; [the State has] no legitimate interest in decisionmaking that is arbitrary and insensitive to substantive federal standards. While a state is free to decide whether to participate in the Medicaid program and receive federal assistance, once the state opts into the Medicaid program it must comply with the strictures of federal law.... The injunctive relief granted by this Court serves the public interest by requiring [the State] to live up to the responsibilities with which [it is] charged under federal law without usurping [the State’s] role in the ratesetting process.
 

 The hardship on the class and the patients it services should the injunction not issue is difficult to assess. It is not apparent from the record how long the nursing home industry could survive without payment, the facilities having been paid in advance for the services they will render. But, the class need not show a balance of hardship in its favor.
 
 We
 
 agree with the trial court’s conclusion that the public interest is threatened and would be disserved if the injunction had not issued and that that alone is a sufficient showing to permit the injunction to issue.
 

 Accordingly, for the reasons stated, we conclude that the trial court did not err in enjoining the State from implementing the Medicaid reimbursement system it promulgated initially as 470 I.A.C. 5-4.2. The judgment of the trial court is therefore affirmed.
 

 Judgment affirmed.
 

 BAKER and NAJAM, JJ., concur.
 

 [1]
 

 . When the class filed its complaint, Ind.Code 12-1-7-17.2(b) provided that
 

 [p]ayment of skilled nursing facility and intermediate care facility services shall, under 42 U.S.C. § 1396a(a)(13)(A), be determined in accordance with a prospective payment rate that is reasonable and adequate to meet the costs that are incurred by efficiently and economically operated facilities in order to provide care and services in conformity with state and federal laws, rules, regulations, and quality and safely standards with a growth or profit factor, as determined in accordance with generally accepted accounting principles, in accordance with rules adopted by the department.
 

 Effective March 20, 1990, the legislature re-enacted this standard as I.C. 12 — 1—7—17.6(b) and clarified that the growth or profit factor was to be determined in accordance with generally accepted accounting principles. The present section became effective June 14, 1991. It no longer requires the payment of "a growth or profit factor.”
 

 [2]
 

 . Before the Boren Amendment, state plans provided for reimbursement on a retrospective basis; that is, health care providers were reimbursed according to the reasonable cost of the services actually provided. Since the passage of the Boren Amendment in 1981, however, most states have adopted plans that are prospective in nature, whereby providers are paid in advance and payments are calculated according to the state’s formula for what such care should cost.
 
 Wilder v. Virginia Hospital Association
 
 (1990), 496 U.S. 498, 507 n. 7, 110 S.Ct. 2510, 2516 n. 7, 110 L.Ed.2d 455.
 

 The State of Indiana has chosen not to approach reimbursement by setting out to define an efficient and economically operated facility or to discern the necessary costs of a desired level of care. Rather, the model of an "efficient and economically operated facility” is implicit in the state’s prospective program. It varies from provider to provider and is dependent ultimately on how the particular provider’s projected expenditures compare with its own historical costs adjusted for inflation, the adjusted historical and projected costs of other providers in the region, and the average rate of change of costs within the nursing home industry nationwide. Under the State's formula, once the State obtains a reasonable allowable cost for a particular provider and any incentives are added, the provider's rate is established at the lowest of five limiters: the market area limiter (a percentage of average allowable cost computed from forecasted data submitted by providers on a regional basis, weighted by beds designated for like levels of care); the calculated rate (allowable per diem costs plus an incentive); the maximum allowable annual rate (increase in prior rate of reimbursement not greater than the most recent twelve-quarter average rate of change in a specified national index); the rate paid to the provider by the general public; or the reimbursement rate requested by the provider. 470 I.A.C. 5-4.2-9(a); 470 I.A.C. 5-4.2-10.
 

 [3]
 

 . Findings # 24 and 31 also relate to the alleged violation of the procedural component of the Boren Amendment. Finding # 24 contains the factual determination that the defendants offered no testimony to prove that the issue of quality of care was even considered in the formulation of the new regulations, while finding #31 reads:
 

 The absence of any evidence presented by the defendants on the issue of quality of care deprives the Court of any basis to draw a conclusion favorable to the defendants regarding either the DPW’s own judgment concerning the interrelationship between the rates to be paid under the proposed regulations and compliance with state and federal laws, regulations and quality and safety standards when it formulated the proposed regulations; or, for the Court to conclude independently of DPW’s action that the interrelationship between the rates to be paid under the proposed regulations and the ability of Indiana nursing homes to comply with state and federal laws, regulations and quality and safety standards is consistent with either the Boren Amendment or the Indiana counterpart thereto.
 

 [4]
 

 . Specifically, the Boren Amendment requires the State to provide
 

 for payment ... of the ... nursing facility services, and services in an intermediate care facility for the mentally retarded provided under the plan through the use of rates (determined in accordance with methods and standards developed by the State, which, in the case of nursing facilities, take into account the costs (including the costs of services required to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident eligible for benefits under this chapter) of complying with subsections (b), ... (c), and of section 1396r ...
 

 [5]
 

 . Finding #30 provides:
 

 The plaintiffs ... have no adequate remedy at law.... Because the implementation of the new regulations will result in a reduction of between Nine to Eleven Million Dollars in reimbursement being paid to the class, the Court finds there is immediate and irreparable harm to the class ... Given the unreasonably high number of facilities which are not reimbursed their actual costs for providing Medicaid services to the citizens of Indiana, the Court finds this poses a significant threat to the continued viability of members of the nursing home industry, the patients they serve as well as the employees who work in nursing homes. For example, one provider testified emphatically that implementation of the new regulations will have a devastating effect upon her facility threatening its continued operation in the very near future.
 

 The public interest and federal and state statutory requirements mandate that Indiana facilities provide quality of care to their patients and, the Court finds that the reimbursement rate reduction caused by the new regulations significantly threatens this public interest. The evidence presented at the prior trial as well as the lack of evidence presented and even considered by the defendants concerning quality of care as well as the serious financial impact these regulations would have on the class, compel the Court to find that the granting of this preliminary injunction would be in the public interest.
 

 [6]
 

 . “17. Plaintiffs and the class have no adequate remedy at law.... There is immediate and irreparable harm by the defendants continually utilizing such illegal regulations and/or unpro-mulgated policies as was established herein. Facilities are being sold or closing because of the imposition of these limiters which prohibit reasonable costs from being reimbursed.”
 

 Tioga I,
 
 575 N.E.2d at 306 (footnote omitted). Our review of the record does not reveal any other finding of irreparable harm in the judgment on the first preliminary injunction.
 

 [7]
 

 . The regulations governing the program permit the HCFA to withhold the federal payment in whole or in part if the administrator finds that in the administration of the plan there is a failure to comply substantially with any of the provisions of § 1902 of the Act. 42 C.F.R. § 430.35(a). A question of noncompliance in practice may arise from the State’s failure to actually comply with a Federal requirement, regardless of whether the plan itself complies with that requirement. 42 C.F.R. § 430.35(c).