No. 70,062

AMERICARE PROPERTIES, INC., *et al., Appellees/Cross-Appellants*, v. DONNA L. WHITEMAN, SECRETARY OF SOCIAL AND REHABILITATION SERVICES, and THE KANSAS DEPARTMENT OF SOCIAL AND REHABILITATION SERVICES, *Appellants/Cross-Appellees*.

(891 P.2d 336)

Opinion filed March 10, 1995.

*Patrick D. Gaston*, of Bennett, Lytle, Wetzler, Martin & Pishny, L.C., of Prairie Village, argued the cause, and *Robert F. Bennett* and *Patricia A. Bennett*, of the same firm, were with him on the briefs for appellants/cross-appellees.

*William E. Enright*, of Scott, Quinlan & Hecht, of Topeka, argued the cause and was on the brief for appellees/cross-appellants.

The opinion of the court was delivered by

DAVIS, J.: This appeal involves a class action filed by Kansas adult care homes challenging the Kansas Department of Social and Rehabilitation Services' (SRS) procedural and substantive basis for Medicaid reimbursement. Medicaid is a joint federal and state program providing medical assistance, including nursing care, to the indigent, aged, and infirm. The defendant SRS is the designated single state agency for administration of Title XIX (Medicaid) programs in Kansas. Defendant Donna L. Whiteman was the appointed head of SRS at the time this action was initiated. The plaintiffs include a number of adult care nursing homes in the state and will hereinafter be referred to collectively as Americare.

SRS State Plan Amendment MS-87-03 reduced State Medicaid reimbursement to Kansas adult care homes effective January 1 through June 30, 1987. Americare filed their petition on January 26, 1987, seeking injunctive relief against State Plan Amendment MS-87-03. Injunctive relief was denied. Americare amended its petition, attacking not only State Plan Amendment MS-87-03 but also attacking Medicaid reimbursement from 1982 through 1986. Americare advanced five counts in its amended petition: (1) declaratory relief pursuant to K.S.A. 60-1701 *et seq.*; (2) relief under 42 U.S.C. § 1983 (1988) against claimed violations of rights conferred upon plaintiffs under the federal Medicaid Act, 42 U.S.C. § 1396a *et seq.* (1988); (3) relief under the Kansas Act for Judicial

Review and Enforcement of Agency Actions, K.S.A. 77-601 *et seq.*; (4) certification of the plaintiff class under K.S.A. 60-223; and (5) damages in excess of $2,000,000.

The district court certified a plaintiff class under K.S.A. 60-223(b)(2) for purposes of counts (1) and (5), defining the class as "[a]ll persons and entities, (skilled nursing facilities (SNF), intermediate care facilities (ICF), and intermediate care facilities for the mentally retarded (ICF/MR)) who have provided or continue to provide Medicaid (Title XIX) services pursuant to 42 U.S.C. § 1396a *et seq.* and K.S.A. 39-708c(x) to the medically indigent, aged and infirm from and after January 26, 1982."

On cross-motions for summary judgment, the trial court granted summary judgment to Americare with respect to State Plan Amendment MS-87-03 effective January 1 through June 30, 1987. The court concluded that SRS had failed to comply with procedural requirements of the federal Medicaid Act, Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.* (1988), and granted judgment in favor of the plaintiff class for the difference between the amount provided for in State Plan Amendment MS-87-03 and the amount reimbursed prior to January 1, 1987. The trial court also granted Americare attorney fees as the prevailing party under 42 U.S.C. § 1983, pursuant to 42 U.S.C. § 1988. On all other counts and issues including Americare's attack for reimbursement from 1982 through 1987, the trial court granted summary judgment to SRS.

SRS appeals from the decision that its State Plan Amendment MS-87-03 failed to comply with the procedural and substantive requirements of the Medicaid Act, 42 U.S.C. § 1396a *et seq.* SRS also appeals the award of attorney fees, contending that the court did not have jurisdiction to consider Americare's claim for relief under 42 U.S.C. § 1983. Americare cross-appealed, arguing that the court erred in finding that the Kansas Medicaid reimbursement system prior to MS-87-03 (from 1982 through 1986) did not violate the Medicaid Act.

In order to frame the issues raised by this appeal, some background concerning the Federal Medicaid Act is appropriate. The recent case of *Pinnacle Nursing Home v. Axelrod,* 928 F.2d 1306

(2d Cir. 1991), provides a description of the operation of the Medicaid Act as well as some pertinent history of the Act.

"The Medicaid Program (the Act) was established pursuant to title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.* (1988). It establishes a joint federal and state cost-sharing system to provide necessary medical services to indigent persons who otherwise would be unable to afford such care. Participation in this system is optional. Once a state does decide to participate, however, it must abide by certain requirements imposed by the Act and regulations promulgated thereunder. To qualify for federal reimbursement, a state must submit to the Secretary [of Health and Human Services] for approval a plan for medical assistance. 42 U.S.C. § 1396a(b). This plan 'is a comprehensive written statement submitted by the agency describing the nature and scope of its Medicaid program and giving assurance that it will be administered in conformity with the specific requirements of title XIX, the regulations in . . . Chapter IV [of the Code of Federal Regulations], and other applicable official issuances of the Department.' 42 C.F.R. § 430.10 (1987). Upon approval of a state plan by the Secretary, the state is entitled to receive reimbursement from the federal government for a percentage of the funds it pays to residential health care facilities which provide medical assistance to Medicaid recipients. 42 U.S.C. § 1396b(a). The remainder of the costs under the Medicaid Program are borne by state and local governments.

"The Medicaid reimbursement methodology has undergone a metamorphosis since its enactment in 1965. When enacted, the Act required reimbursement of the 'reasonable cost' of in-patient services rendered to Medicaid patients in nursing and intermediate care facilities. In 1972, Congress modified this 'reasonable cost' standard in response to a perception that the Secretary exercised too much control over reimbursement rates. See *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 110 S. Ct. 2510, 2515 (1990). The new law required states to reimburse 'the reasonable cost[s] . . . as determined in accordance with methods and standards which shall be developed by the State and reviewed and approved by the Secretary.' *Id.* (quoting Pub. L. 92-603, § 232(a), 86 Stat. 1329, 1410-11 (1972)). Its enactment marked the beginning of congressional efforts to provide the states with greater flexibility to develop their own schemes of reimbursement. This trend continued with the enactment of the Boren Amendment in 1980. 42 U.S.C. § 1396a(a)(13)(A). *See* Omnibus Budget Reconciliation Act of 1980, Pub. L. 96-499, § 962(a), 94 Stat. 2650. The Boren Amendment repealed the 'reasonable cost' standard of reimbursement existing under the prior law, replacing it with a standard which required reimbursement at rates that 'are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities'. 42 U.S.C. § 1396a(a)(13)(A). As currently formulated, the Boren Amendment provides that a state plan for medical assistance must

'provide . . . for payment . . . of the hospital services, nursing facility services, and services in an intermediate care facility for the mentally retarded provided

under the plan through the use of rates (determined in accordance with methods and standards developed by the State . . .) which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards and to assure that individuals eligible for medical assistance have reasonable access (taking into account geographic location and reasonable travel time) to inpatient hospital services of adequate quality. . . .'

*Id.*

"The Boren Amendment was enacted with two specific purposes in mind: (1) to provide the states with greater flexibility in developing methods of reimbursing skilled nursing facilities, intermediate care facilities, and inpatient hospital services; and (2) to increase the economy and efficiency of all plans. S. Rep. No. 139, 97th Cong., 1st Sess. 478, *reprinted in* 1981 U.S. Code Cong. & Admin. News 396, 744; *see also Colorado Health Care Ass'n v. Colorado Dep't of Social Servs.*, 842 F.2d 1158, 1165 (10th Cir. 1988). 'The flexibility given the States[, however, was] not intended to encourage arbitrary reductions in payment that would adversely affect the quality of care.' S. Rep. No. 139, *supra*, at 744.

"The regulations promulgated under the Act require that a state make findings '[w]henever the Medicaid agency makes a change in its methods and standards, but not less often than annually . . . .' 42 C.F.R. § 447.253(b). Pursuant to that regulation, a state must find that '[t]he Medicaid agency pays for inpatient hospital services and long-term care facility services through the use of rates that are reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated providers . . . .' 42 C.F.R. § 447.253(b)(1)(i)." 928 F.2d at 1309-10.

The term "efficiently and economically operated facility" is not defined in the Boren Amendment, 42 U.S.C. § 1396a(a)(13)(A), and the Secretary of Health and Human Services has declined to adopt a definition, instead allowing the individual states to make that determination. 48 Fed. Reg. 56,049 (1983). Furthermore, the Secretary did not mandate that an individual state explicitly make such a definition, providing instead that the standards for reimbursement set by the state could implicitly act as a definition of an "efficiently and economically operated facility." 48 Fed. Reg. 56,049.

Federal regulations provide that whenever the state Medicaid agency makes a change in its methods and standards, but not less often than annually, it must make the required findings. 42 C.F.R. § 447.253(b) (1993). However, it need only submit assurances to

the reviewing agency, in this case the Health Care Financing Administration (HCFA), when the plan is actually amended. 42 C.F.R. § 447.253(a).

The first question raised in this appeal deals with the change in the amount of Medicaid reimbursement effected by State Plan Amendment MS-87-03, effective January 1 through June 30, 1987. SRS contends that contrary to the district court's conclusion, SRS did engage in a bona fide findings process when implementing the change and therefore complied with the procedural as well as substantive requirements of the Boren Amendment.

The second question involves Americare's contention that the entire Medicaid plan adopted by SRS from 1982 through 1987 violates the Boren Amendment. Specifically, Americare argues that the findings made by SRS during those years were not sufficient to comply with the Boren Amendment.

## Kansas Reimbursement System

During the relevant times considered in this opinion, Kansas used a cost-related system to reimburse adult care homes. Under this system, the providers filed an annual cost report which is broken down into allowable costs for five different cost centers: (1) Administration; (2) Property; (3) Room and Board; (4) Health Care; and (5) Total. The allowable costs are then divided by the total resident days to establish a per diem rate. An inflation factor was added to the rate, resulting in a total per diem rate for each cost center.

Each individual cost center of each facility was then compared to the same category cost centers of similarly classified providers. Those that fell below a certain percentile limit were reimbursed for their costs. Those that fell above a certain percentile limit were reimbursed the cost of the facility at the percentile limit. Prior to January 1, 1987, these percentiles were:

| | |
|---|---|
| Administration | 75th percentile |
| Property | 85th percentile |
| Room and Board | 90th percentile |
| Health Care | 90th percentile |

Total            ·       75th percentile

By way of illustration, if a facility had a per patient day administration cost of $4.50, this would be compared with all other facilities' per patient day administrative costs. The per patient day administrative cost at the 75th percentile (*i.e.*, 75% of the institutions had per patient day administrative costs at or lower than this cost) would be the upper limit for reimbursement. Thus, if the facility at the 75% percentile had a per patient day administrative cost of $4.50, each facility with a cost at or below that figure would get full reimbursement. However, a facility with a per patient day administrative cost of over $4.50 would be reimbursed simply $4.50. The other cost centers are calculated in the same manner.

However, the fifth or "Total" cost center adds a new wrinkle. This cost center compares the per patient day total cost of each institution. Under the system existing prior to January 1, 1987, the percentile for the Total cost center was the 75th percentile. Therefore, the upper limit for total cost reimbursement was established at the 75th percentile level. Because of the application of the Total cost center, a nursing home facility would be eligible for full reimbursement if each individual cost center was below the upper limit for that specific cost center, but would still be denied full reimbursement if its total for the four cost centers was above the upper limit established for the Total cost center.

In addition to the reimbursement rate, participating facilities are eligible to receive additional payments in the form of an efficiency factor, a 24-hour nursing factor, and a property value factor. The total of all these factors equals the total reimbursement that will be paid under SRS's prospective system to that specific facility for the next year. According to SRS, a facility is considered to be economical and efficient if its total reimbursement meets or exceeds its total allowable costs.

On December 25, 1986, SRS announced in the Kansas Register State Plan Amendment MS-87-03, effecting a change in the Medicaid reimbursement rate for a period of 6 months commencing January 1, 1987. MS-87-03 reduced four of the five cost centers percentiles used to calculate the Medicaid reimbursement rate:

| | |
|---|---|
| Administration | Reduced to 60th percentile from the 75th percentile |
| Room and Board | Reduced to 60th percentile from the 90th percentile |
| Property | Reduced to 60th percentile from the 85th percentile |
| Total | Reduced to 65th percentile from the 75th percentile |

This change was made because of projected state revenue shortfalls for the fiscal year 1987. SRS estimated that the reduction would save $803,000 in state funds through fiscal 1987. The total reduction in Medicaid payments to facilities, considering the loss of matching funds which would have been paid by the federal government, totalled approximately $1.6 million. MS-87-03 was rescinded on July 1, 1987, as planned.

### Standard of Review

The facts in this case are essentially undisputed. SRS claims that its actions complied with the requirements of the Boren Amendment. Americare claims that SRS's actions did not comply. "Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Patterson v. Brouhard,* 246 Kan. 700, 702, 792 P.2d 983 (1990).

The Boren Amendment requires a state to make reimbursement to providers through the use of rates which it "finds," and "makes assurances" satisfactory to HCFA, are reasonable and adequate to meet the costs incurred by efficiently and economically operated facilities. SRS made such assurances to HCFA. The district court, however, found that SRS failed to engage in a findings process sufficient to allow SRS to make such assurances.

The law is well established that states must both procedurally and substantively comply with the requirements of the Boren Amendment. *Abbeville General Hosp. v. Ramsey,* 3 F.3d 797, 802 (5th Cir. 1993), *cert. denied* ___ U.S. ___, 128 L. Ed. 2d 194

(1994). See *AMISUB (PSL) v. State of Colo. DSS*, 879 F.2d 789, 795 (10th Cir. 1989), *cert. denied* 496 U.S. 935 (1990) (finding that, in passing on the validity of a state Medicaid plan, the court must determine whether the plan is procedurally and substantively in compliance); *Illinois Health Care Ass'n v. Bradley*, 983 F.2d 1460, 1463 (7th Cir. 1993). The responsible state agency must procedurally find that the rates are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities, and the plan must substantively adopt rates that are actually reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities. *Abbeville*, 3 F.3d at 802.

The standard of review in determining whether the state satisfied the procedural requirements of the Boren Amendment is a de novo standard. We are not alone in our conclusion on this issue. See *Kansas Health Care v. Kansas Dept. of Soc. & Reh.*, 31 F.3d 1536, 1544 (10th Cir. 1994); *Abbeville*, 3 F.3d at 802; *Temple University v. White*, 941 F.2d 201, 209 (3d Cir. 1991), *cert. denied* 502 U.S. 1032 (1992); *AMISUB*, 879 F.2d at 795-96.

Some authority exists for the proposition that the standard of review on procedural compliance should be deferential. Those courts favoring a deferential standard of review do so because they believe that the approval of the reimbursement plan by the Secretary or HCFA is a product of state and federal agency action calling for a deferential arbitrary and capricious standard of review. See *Illinois Health Care*, 983 F.2d at 1462-63; *Pinnacle Nursing Home*, 928 F.2d at 1312-13. However, *Abbeville* notes that neither the Secretary nor HCFA participate in the findings process required by the Boren Amendment, but instead are limited to reviewing the assurances provided by the state agency. 3 F.3d at 802 n.7. We agree with *Abbeville* that the findings requirement under the Boren Amendment is not a product of state and federal agency action. Procedural compliance with the factual findings required by the Boren Amendment is subject to a de novo standard of review.

However, the question of whether a state has complied with the substantive requirements of the Boren Amendment, in our

opinion, calls for a deferential standard of review. In a pre-Boren Amendment case where we dealt only with the issue of substantive compliance with the Medicaid reimbursement regulation, we adopted a deferential standard of review. In *Country Club Home, Inc. v. Harder*, 228 Kan. 756, 763, 620 P.2d 1140 (1980), this court stated:

"At the outset we should be mindful of the following rules. A court may not substitute its judgment for that of the Secretary of Social and Rehabilitation Services in determining which method is preferable to determine a reasonable cost-related basis for reimbursing long term care facilities, a court should not intrude into areas of administrative discretion, and it must protect the director's right to select among effective options."

Once a state agency has complied with the procedural requirements of the Boren Amendment, it is vested with substantial discretion in choosing among reasonable methods of calculating rates. See *Wilder v. Virginia Hospital Assn.*, 496 U.S. 498, 520-24, 110 L. Ed. 2d 455, 110 S. Ct. 2510 (1990). Because of this discretion, substantive compliance with the Boren Amendment should be subject to a deferential arbitrary and capricious standard of review. See *Abbeville*, 3 F.3d at 803-04 (finding that a de novo review of the state's factfinding process and arbitrary and capricious review of the findings and rates "strikes a balance between Congress's view of the federal role under the Medicaid Act and general principles of federalism, which do not permit states to be final arbiters of their compliance with federal law"); *Illinois Health Care*, 983 F.2d at 1463; *Pinnacle Nursing Home*, 928 F.2d at 1313. We note that the 10th Circuit has held that substantive compliance with the Boren Amendment is a question subject to de novo review, with no deference given to the agency's determination. *Kansas Health Care*, 31 F.3d at 1544; *AMISUB*, 879 F.2d at 795-96. Apparently, the 10th Circuit does so because it feels that a state agency's determination of compliance with federal law is not entitled to the same deference afforded a federal agency. See *AMISUB*, 879 F.2d at 795-96. However, in light of the substantial discretion vested in the state agency and consistent with our prior decision in *Country Club Home, Inc.*, we conclude that SRS's substantive compliance with the Boren Amendment

should be reviewed under the deferential standard of whether that agency's action is arbitrary and capricious.

## Procedural Compliance

The question of what a state agency must do in order to procedurally comply with the Boren Amendment has been litigated often. It is undisputed that a state agency is required to make findings that its rates are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities as a prerequisite to making assurances to HCFA. See *Wilder v. Virginia Hospital Assn.*, 496 U.S. at 513 n.11. The question becomes what form the "findings" must take.

In *AMISUB*, the 10th Circuit Court of Appeals stated that the plain language of the Boren Amendment requires at the minimum that the state Medicaid agency make findings which identify and determine (1) efficiently and economically operated hospitals; (2) the costs that must be incurred by such hospitals; and (3) payment rates which are reasonable and adequate to meet the costs of those hospitals. 879 F.2d at 796. This same test has been used by the Second Circuit Court of Appeals. See *Pinnacle Nursing Home*, 928 F.2d at 1314.

Other courts have found the test expressed in *AMISUB* to be too restrictive. In *Illinois Health Care*, the Seventh Circuit Court of Appeals found that a state is not required to identify a particular home or group of homes as efficient but must instead determine its own standard for an efficient and economic facility and then make findings which establish a nexus between the costs of operating those facilities and the proposed reimbursement rate. 983 F.2d at 1465. See *Pinnacle Nursing Home;* 928 F.2d at 1314. In *Folden v. Washington State DSHS*, 981 F.2d 1054, 1057-58 (9th Cir. 1992), the Ninth Circuit Court of Appeals held that the identification of efficient and economic facilities could be made implicitly by the method established for reimbursement and that the state agency's findings process is sufficient if the agency has considered, on the basis of some reasonably principled analysis, whether its payment rates meet the standard set by the Boren Amendment.

In attempting to reconcile conflicting views on what a state agency must do in order to procedurally comply with the Boren Amendment, the Third Circuit Court of Appeals stated:

"Whether a court chooses to require a 'reasonably principled analysis' or a 'nexus' or a profile of efficiently and economically operated hospitals is not crucial in determining compliance with the findings requirement. All three of these cases adopt their own terminology to answer the same question. That is, what is the minimum quantum of evidence that an agency must possess in its cognition to substantiate its assurances . . . ." *Abbeville*, 3 F.3d at 805.

The court in *Abbeville* concluded that the state agency must show it conducted an objective analysis, evaluation, or some type of factfinding process to determine the effects of the rate on the level of care Medicaid patients receive. 3 F.3d at 805. As part of the factfinding process, the state agency must compare its rates against the objective standard of an efficiently and economically operated facility. 3 F.3d at 805.

An examination of cases dealing with the procedural requirement of the Boren Amendment, as well as an examination of the amendment itself, leads us to the following conclusions. First, the Boren Amendment clearly provides that the state agency is required to find that its rates are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities. *Wilder*, 496 U.S. at 514-15. This requirement is not a "mere formality that can be satisfied simply by having a state officer think a bit about hospital costs and then copy out the statutory language on a piece of paper, put the heading 'assurances' on that piece of paper and send it to HCFA." *Abbeville*, 3 F.3d at 805.

Second, the state agency is required to identify generally its standard for determining which facilities are efficiently and economically operated and the costs of operating those facilities. It is clear that such an identification can be implicit in the state's methods and standards. *Illinois Health Care*, 983 F.2d at 1465. See 48 Fed. Reg. 56,051. In other words, a state agency may set a standard based on reported costs and services, wherein a facility with costs above this standard would not be fully reimbursed.

Finally, the state agency must make a finding that the rates at which it reimburses facilities are reasonable and adequate to meet

the costs that must be incurred by those facilities. In doing so, it must conduct an objective analysis, evaluation, or some type of factfinding process to determine the effects of the rates on the level of care Medicaid patients receive and, as part of this process, compare its rates against the objective standard of an efficiently and economically operated institution. *Abbeville*, 3 F.3d at 805. There is a presumption that a state agency will engage in a bona fide finding process before it makes assurances. *Kansas Health Care*, 31 F.3d at 1539.

### State Plan Amendment MS-87-03

SRS contends that the district court erred in determining that State Plan Amendment MS-87-03, effective January 1 through June 30, 1987, failed to comply with the procedural and substantive requirements of the Boren Amendment. The real argument on this issue centers upon whether SRS met the procedural requirements of the Boren Amendment when changing reimbursement rates in 1987.

SRS argues that budgetary considerations can be a reason or even the sole reason for rate adjustments. Regulations promulgated by HCFA state that "States may use budget considerations in setting their payment rates as long as the State can make a finding that the resulting rates are reasonable and adequate." 48 Fed. Reg. 56,051 (1983). One of the major problems with the position of SRS is that it based its determination of which facilities were economically and efficiently run on the amount of appropriated funds available.

While budgetary considerations may play a part in determining the rates that are to be paid, there is no authority to allow budgetary considerations to play a part in determining which facilities are efficiently and economically operated. Rather, the standard for an efficiently and economically run institution should be an objective one. If SRS were allowed to make its determination of which facilities were economically and efficiently operated based on the amount of money available, then SRS's rates would never be subject to review because, under SRS's implicit definition, an economical and efficient institution is one which receives all of its necessary costs.

While states are not required to identify specific institutions which are efficiently and economically operated, there must be some objective benchmark against which payment rates can be judged. See *Abbeville*, 3 F.3d at 805. A state agency cannot simply change its definition of an efficiently and economically operated institution whenever it seeks to change its rates. Prior to MS-87-03, SRS determined that facilities were economically and efficiently operated if their administrative costs were at or below the 75th percentile, property costs were at or below the 85th percentile, room and board costs were below the 90th percentile, health care costs were below the 90th percentile, and total costs were below the 75th percentile when compared with other facilities of the same type. SRS, based on budgetary considerations, made a decision to reduce all categories to the 60th percentile by concluding that reimbursement at this rate reimbursed facilities in an amount reasonable and adequate to meet the costs that must be incurred by those facilities. The assumption is that the facilities are efficiently and economically operated facilities. No findings were made to determine whether something happened on January 1, 1987, to render a large portion of those facilities being reimbursed at the higher percentiles in 1986 inefficient or uneconomical.

Once SRS determined the benchmark it would use for defining efficient and economical institutions, it was bound by the Boren Amendment to adopt rates which would ensure that those institutions would receive, at a minimum, the costs that must be incurred by an efficiently and economically operated facility providing the same services. SRS makes a persuasive argument that the reimbursement rate selected does exactly that. We acknowledge that the rate of reimbursement may very well accomplish the objectives of the Boren Amendment, but there is no way we can measure whether this objective is accomplished. In order to comply procedurally with the Boren Amendment, SRS must make findings that the rates at a minimum are reasonable and adequate to reimburse those institutions.

SRS contends that it made such findings and that its decision was based on the following factors:

1. The agency's decision that the resulting rate would still be within a "zone of reasonableness";

2. the agency's analysis of its overall budget for the best places to make cuts;

3. the governor's budget directive;

4. comparisons of the financial consequences derived from the agency's choice;

5. the effect of the percentile changes on the Medicaid program as a whole;

6. the fact that this court had previously approved of the percentile methodology in *Country Club Home Inc. v. Harder* and found that reimbursement at the 75th percentile was not, as a matter of law, unreasonable;

7. the Secretary of SRS's judgment based on experience that the percentile adjustment would still produce reimbursement rates within the lower zone of the range of reasonableness; and

8. SRS's projection that even with the lowered percentiles, rates would still be sufficient to reimburse the majority of the facilities the majority of their costs.

A review of the above findings convinces us that most findings are conclusions and assumptions having little to do with the procedural requirements of the Boren Amendment. None of the findings represent an objective analysis, evaluation, or some type of factfinding process to determine the effects of the rate on the level of care Medicaid patients receive. There is no indication that SRS compared its rates against an objective standard of an efficiently and economically operated facility.

A review of the record indicates that SRS compared the expected costs of facilities with those facilities' expected reimbursement under the new method. SRS found that of the majority of the skilled nursing home facilities, 67%, would be reimbursed 90% or more of their costs adjusted for inflation, although only 29% would be reimbursed 100% of their costs. For intermediate facilities, 78% of the facilities would be reimbursed 90% or more of their costs adjusted for inflation, although only 37% would be reimbursed in full. SRS then analyzed those facilities which would receive 100% or more of their costs adjusted for inflation under

the amendment to see if they were a representative sample. SRS determined that they were representative of the industry and, therefore, should set the standard for an economically and efficiently run facility.

The problem with SRS's findings is that the findings take into account only those facilities that are expected to be fully reimbursed under the new amendment and then assume that those facilities are economically and efficiently operated. The findings assume that because these certain facilities are reimbursed in full, they are economically and efficiently operated and determine only that because they are economically and efficiently operated, they should be reimbursed in full. The findings do not take into account those institutions which were presumably economically and efficiently operated prior to the amendment, yet are now denied reimbursement for their expenses.

SRS argues that because its rates under MS-87-03 mean that the majority of the institutions receive 90% or more of their costs, the rates are within the zone of reasonableness to reimburse those costs which must be incurred by an economically and efficiently run facility. This may very well be so. However, because the method by which SRS determines what constitutes an efficiently and economically operated facility changes with an increase or decrease in rates, there is no objective standard by which the costs that must be incurred by efficiently and economically operated facilities can be determined. As a result, SRS's findings do not compare reimbursement rates with an objective standard of an efficiently and economically operated institution as required by the Boren Amendment.

Our holding does not prevent SRS from adopting reimbursement rates which are lower than the rates at which it has previously reimbursed facilities in response to budgetary cuts. We recognize that budgetary constraints are a real problem and that SRS is often confronted with the unenviable choice of determining where and how cuts are to be made. However, in order to support such rate reductions, SRS must, at the minimum, make findings that the new rates are adequate to meet the costs which must be incurred by a facility meeting some objective standard

of economic and efficient operation. It may not simply change its objective standard so that fewer facilities are considered economically and efficiently operated. To do so would frustrate the purpose of the Boren Amendment, which is to ensure that, at a minimum, rates are reasonable and adequate to meet the needs of an efficiently and economically operated institution.

We do not hold that SRS may never change its definition of an efficiently and economically operated institution. SRS is free to adopt a new objective benchmark as long as it makes findings which establish a connection between its new standard and the actual costs facilities must bear. If SRS finds that some facilities at its current benchmark are not operating efficiently or economically, it is free to change the benchmark.

SRS's findings with regard to MS-87-03 fail to establish a connection between the rates chosen and the costs which must be incurred by an efficiently and economically operated institution. As a result, MS-87-03 procedurally violates the Boren Amendment, and the district court did not err in holding it invalid. Because of our decision, we need not address whether MS-87-03 substantively violates the Boren Amendment.

Medicaid Reimbursement from 1982 through 1987

Americare asserts in their cross-appeal that the entire Medicaid reimbursement plan adopted by SRS from 1982 to 1987 violates the Boren Amendment. Americare argues that the findings made by SRS during those years were not sufficient to comply with the Boren Amendment. We disagree.

The crux of Americare's contentions is that SRS conducted no empirical analysis to determine whether its rates reasonably and adequately compensated efficient and economically operated facilities. Americare acknowledges that SRS need provide assurances to HCFA only when it amends its plan but notes that SRS must make annual findings that its rates are adequate to meet the Boren Amendment standard. See 42 C.F.R. § 447.253(b). Americare contends that SRS did not make adequate findings.

During the years in question, SRS had an established benchmark standard for determining which facilities were economically

and efficiently operated. As noted above, a facility was deemed to be efficient if its administrative costs were at or below the 75th percentile, property costs were at or below the 85th percentile, room and board costs were at or below the 90th percentile, and total costs were at or below the 75th percentile when compared with other facilities of the same type.

As the result of SRS's payment scheme, all those institutions which were identified by SRS as being economically and efficiently operated were reimbursed not only at rates that were reasonably adequate to reimburse them for their necessary costs but also at rates which reimbursed these institutions for all of their allowed reported costs and, in some instances, above their reported costs. As long as the percentiles did not change, SRS had an objective standard which identified those institutions which were economically and efficiently operated as well as the costs that such institutions must bear as required by the Boren Amendment. Because SRS's cost center percentiles did not change from year to year, the only findings that were necessary to comply with the Boren Amendment were that those institutions which had been identified as economically and efficiently operated were reimbursed for their necessary expenses. The payment methodology used by SRS made those findings implicit.

The distinction between the payment system prior to 1987 and the payment system implemented by MS-87-03 is crucial. When SRS set the percentiles in 1982, these percentiles implicitly provided the definition of institutions which were economically and efficiently operated. Instead of making findings based upon the benchmark established in 1982 and carried forth until December 31, 1986, for reimbursement rates after January 1 through June 30, 1987, SRS changed the standard for determining which institutions were economically and efficiently operated. At the same time, as held above, it made no findings to support this change.

Such a problem is not present, however, from 1982 through 1986. During those years, SRS had one standard which identified economically and efficiently operated institutions and had adopted rates which were linked to that standard and which by definition reimbursed those facilities meeting the standard for their nec-

essary costs. It was only when SRS decided to change the standard for this determination in response to budgetary shortfalls that problems arose. Since SRS adopted new rates without adequate findings, there was no way to determine whether the new reimbursement rates reimbursed those facilities which had previously been identified as economically and efficiently operated for their necessary costs. As a result, up until the adoption of MS-87-03, findings which indicated the costs of each institution were sufficient to allow SRS to comply with the Boren Amendment since SRS could be sure that every institution which had been identified by its standard as economically and efficiently operated was receiving at least its necessary costs, and in most cases, greater than its necessary costs.

Because SRS had an objective benchmark against which it could measure its rates, and because it made the requisite findings that its overall payment rates were sufficient to meet the costs of those institutions it defined as efficiently and economically operated, it complied with the procedural requirements of the Boren Amendment from 1982 through 1986.

### Substantive Compliance with Boren Amendment from 1982 through 1986

The next question is whether SRS's payment plan from 1982 through 1986 complied with the substantive requirements of the Boren Amendment. As mentioned above, SRS is required not only to find that its rates are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities but also to actually adopt rates which are reasonable and adequate. *Wilder v. Virginia Hospital Assn.*, 496 U.S. 498, 514-15, 110 L. Ed. 2d 455, 110 S. Ct. 2510 (1990).

In reviewing SRS's plan for substantive compliance, we adopt a deferential standard of review. See *Abbeville General Hosp. v. Ramsey*, 3 F.3d 797, 803-04 (5th Cir. 1993). We will only invalidate the plan upon a showing that SRS's findings are arbitrary and capricious or are not supported by substantial competent evidence. See *Kansas Racing Management, Inc. v. Kansas Racing Comm'n*, 244 Kan. 343, 365, 770 P.2d 423 (1989). We keep in

mind that HCFA has stated the phrase "reasonable and adequate" is not a precise number but rather a rate which falls within a range or zone of reasonableness. 48 Fed. Reg. 56,049. See *Folden v. Washington State DSHS*, 981 F.2d 1054, 1058 (9th Cir. 1992).

Although Americare alleges that the rates adopted by SRS fail to adequately reimburse efficiently and economically operated institutions, it points to no evidence which would support this conclusion. According to SRS's findings, the payment system as it stood prior to the enactment of MS-87-03 fully reimbursed over 50% of the nursing facilities 100% of their allowable costs. We cannot say that these rates are arbitrary and capricious absent some showing that an institution which could be considered efficiently and economically operated was not being fully reimbursed for necessary costs. We find no such proof in the record.

Americare makes no specific arguments regarding any of the other components of the reimbursement system such as the inflation factor, real and personal property factor, and 85% occupancy rule other than the basic argument that SRS's reimbursement system violates the Boren Amendment. In its statement of facts, Americare hints that these factors also contribute to noncompliance. However, the record is devoid of proof that any of these factors have caused the rates adopted by SRS to substantively violate the Boren Amendment by causing them to fall below those which would be termed reasonable and adequate. We conclude that the Medicaid reimbursement from 1982 through 1986 did not violate the substantive requirements of the Boren Amendment and affirm the judgment of the district court on this issue. Because of our ruling on this issue, we need not consider SRS's arguments that challenges the reimbursement system on the bases of statute of limitations, acquiescence, res judicata, and collateral estoppel.

### Attorney Fees

SRS next argues that the district court erred in considering Americare's claims under 42 U.S.C. § 1983 absent a claim for prospective relief. According to SRS, while providers can use 42 U.S.C. § 1983 as a mechanism to challenge the actions of state Medicaid agencies, the claim can only be for prospective relief.

As part of its contentions, Americare alleged that SRS's actions violated Americare's rights under the Boren Amendment, entitling Americare to damages and attorney fees under 42 U.S.C. § 1983 *et seq*. The district court agreed and entered judgment pursuant to Americare's 42 U.S.C. § 1983 claim for damages arising out of the adoption of MS-87-03.

42 U.S.C. § 1983 provides a cause of action against any person acting under color of state law for violations of rights secured by federal statutes. *Maine v. Thiboutot*, 448 U.S. 1, 4, 65 L. Ed. 2d 555, 100 S. Ct. 2502 (1980). In addition to damages, a prevailing party under 42 U.S.C. § 1983 can also receive attorney fees under 42 U.S.C. § 1988. The Boren Amendment creates a right enforceable pursuant to 42 U.S.C. § 1983 to have a state comply with the procedural and substantive requirements of the amendment. *Wilder*, 496 U.S. at 524.

SRS argues that while facilities may seek relief under 42 U.S.C. § 1983 for violations of the Boren Amendment, the suit may be only for prospective injunctive relief because the Eleventh Amendment bars the granting of retrospective relief against a sovereign state. SRS contends that because Americare's claim under the amended petition is only for damages and attorney fees, the claim is not viable.

The Eleventh Amendment to the United States Constitution prohibits suits against sovereign states in federal court. However, the Eleventh Amendment is not a concern here because, contrary to SRS's assertion, it does not apply to suits in state courts. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 63-64, 105 L. Ed. 2d 45, 109 S. Ct. 2304 (1989). The real question asserted by SRS is whether a state agency qualifies as a "person" under 42 U.S.C. § 1983. Because 42 U.S.C. § 1983 authorizes only suits against "persons," if a state agency does not qualify as a person, a suit under 42 U.S.C. § 1983 cannot be maintained.

In *Will*, 491 U.S. at 71, the United States Supreme Court concluded that neither a state nor its officials acting in their official capacities are persons under 42 U.S.C. § 1983. However, a state official is considered a person when the action is one for injunctive relief. 491 U.S. at 71 n.10. This is because "official-ca-

pacity actions for prospective relief are not treated as actions against the State." *Kentucky v. Graham*, 473 U.S. 159, 167 n.14, 87 L. Ed. 2d 114, 105 S. Ct. 3099 (1985).

Although *Wilder* held that a facility could sue under 42 U.S.C. § 1983 for violations of the Boren Amendment, this authorization extended only to suits for prospective injunctive relief. 496 U.S. at 517-18. The *Wilder* Court noted that Congress had at one time passed and later repealed a statute commanding states to waive immunity from suit for violations of the Medicaid Act but concluded that the repeal of the statute should not foreclose an action for prospective injunctive relief. 496 U.S. at 517.

Americare cites *Gumbhir v. Kansas State Board of Pharmacy*, 231 Kan. 507, 646 P.2d 1078 (1982), *cert. denied* 459 U.S. 1103 (1983), for the proposition that a state agency can be considered a "person" under 42 U.S.C. § 1983 in state court. However, *Gumbhir* was decided before *Will v. Michigan Dept. of State Police*. Furthermore, the court in *Gumbhir* held only that a state agency could be considered a person where prospective injunctive relief was sought. 231 Kan. at 513.

Because the district court's decision did not extend to any challenges to Kansas' Medicaid plan following the repeal of MS-87-03, and because MS-87-03 had been rescinded by the time judgment was entered, the district court had no jurisdiction to consider Americare's prospective claims under 42 U.S.C. § 1983. After MS-87-03 was rescinded in August of 1987, any judgment the court could have entered under this section would have been for retrospective monetary damages only, and these forms of relief are barred by the holding in *Will*.

The result of this lack of jurisdiction is that Americare cannot be classified as a prevailing party on a 42 U.S.C. § 1983 claim. Americare is therefore not entitled to attorney fees under 42 U.S.C. § 1988.

Affirmed in part and reversed in part.