A00A1654, A00A1655. TOAL et al. v. DEKALB MEDICAL
CENTER, INC. et al.; and vice versa.
(542 SE2d 184)

RUFFIN, Judge.

DeKalb Medical Center and various other hospitals sued the Georgia Department of Medical Assistance (DMA), claiming, among other things, that DMA's Medicaid reimbursements to the hospitals breached the terms of their respective provider agreements.[1] The trial court granted summary judgment to the hospitals on certain

---

[17] *Grimes v. State*, 245 Ga. App. 277, 279 (3) (537 SE2d 720) (2000).
[18] Id.
[19] See *Howard v. State*, 233 Ga. App. 724, 729-730 (7) (505 SE2d 768) (1998).
[20] See *Cottingham v. State*, 206 Ga. App. 197 (1) (424 SE2d 794) (1992) (standard for reviewing denial of directed verdict of acquittal is same as for reviewing sufficiency of evidence).
[1] After the filing of this lawsuit, a new department, the Department of Community Health, was created to consolidate various state agencies. DMA is now a division of the Department of Community Health, and is known as the Division of Medical Assistance.

issues and to DMA on others. Both sides appeal aspects of the trial court's ruling.

Medicaid is a federal-state program under which the federal government provides financial assistance to states to enable them to provide medical care to needy individuals.[2] To qualify for federal assistance, a state must formulate a plan and submit it for approval to the federal Health Care Financing Agency (HCFA), an agency of the Department of Health & Human Services (HHS).[3] Among other things, the plan must contain a scheme for reimbursing health care providers who provide services to Medicaid patients.[4] During the time period relevant in this case, a provision of the Medicaid Act known as the Boren Amendment required that state plans must provide for hospitals to be reimbursed at rates "which the State finds, and makes assurances satisfactory to the Secretary [of HHS], are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities."[5] The Boren Amendment has both a procedural and a substantive component — i.e., the State must make the requisite findings and assurances, and must also adopt rates that are in fact reasonable and adequate.[6]

DMA is the state agency that administers the Medicaid program in Georgia, and it enters into "provider agreements" with various hospitals that render services to Medicaid patients. Up until August 1996, DMA would reimburse hospitals for Medicaid patients treated on a "per case" basis — i.e., it would pay hospitals a certain amount per Medicaid patient admitted, regardless of the treatment provided or length of stay. This "per case rate" differed for each hospital, and was calculated by taking the hospital's total audited Medicaid costs in a base year (typically three years before the reimbursement year), adjusting these costs for inflation to predict Medicaid costs in the reimbursement year, and dividing the resulting amount by the number of Medicaid admissions in the base year. This methodology was developed in part to encourage cost efficiency, since hospitals that reduced their costs during a particular year could keep the difference between their actual costs and the costs reflected in the per case rate. Cost efficiencies would also act in the State's interest, since an efficient hospital's reduced costs would serve as the basis for setting its

---

[2] See *Wilder v. Virginia Hosp. Assn.*, 496 U. S. 498, 502 (110 SC 2510, 110 LE2d 455) (1990).

[3] See *AMISUB (PSL), Inc. v. Colorado Dept. of Social Svcs.*, 879 F2d 789, 794 (10th Cir. 1989).

[4] See *Wilder*, supra.

[5] 42 USC § 1396a (a) (13) (A). See *Wilder*, supra at 502-503. This provision was repealed on August 5, 1997, although it was in effect at all relevant times in this case.

[6] See *Wilder*, supra at 510; *Americare Properties v. Whiteman*, 257 Kan. 30, 38-39 (891 P2d 336) (1995).

future per case rates. During 1992 and 1993, and presumably in other years, certain institutions (including the plaintiffs in this case) thus received reimbursements from DMA that exceeded their actual Medicaid costs.

Effective August 15, 1996, the DMA adopted an amended reimbursement plan that sought to recoup the "excess" reimbursements garnered by some hospitals in 1992 and 1993. This amended plan retained the same basic structure as the prior plan, providing that per case rates would be based on hospitals' audited costs in 1993, adjusted for inflation. With respect to those hospitals that had garnered "excess" Medicaid reimbursements in 1992 and 1993, however, the plan provided that "[p]rospective per case rates will be adjusted to deduct an amount per case for 90% of the average amount that Medicaid payments exceeded the cost of services provided during fiscal years 1992 and 1993." Thus, these hospitals would suffer two consequences: (1) their base per case rates would be reduced to reflect the fact that their actual costs per patient in 1993 were lower than anticipated, and (2) their per case rates would be *further* reduced due to the "excess" payments they had received in 1992 and 1993. The resulting per case rates for these hospitals would thus be less than the actual cost per patient incurred in 1993, adjusted for inflation.

In response to HCFA's requests for clarification, DMA provided written assurances that the *aggregate* payments to hospitals under the amended plan would "meet the costs that must be incurred by efficiently and economically operated hospitals." DMA subsequently informed HCFA that it estimated that 125 hospitals would receive payments greater than their actual costs, while 38 hospitals would receive payments less than their actual costs. HCFA approved the plan in a May 28, 1997 letter, which referenced DMA's written responses and also stated that DMA had

> in a subsequent telephone call indicated that all efficiently and economically operated facilities are expected to be paid 100 percent of allowable costs. . . . Based on this additional clarification, the State's assurances and related rate information, we have approved [the amended plan].

The plaintiffs sued the DMA, alleging, among other things, that the 1996 plan violated the terms of their 1997 provider agreements.[7]

---

[7] The hospitals had previously filed an action in federal court under 42 USC § 1983, seeking declaratory and injunctive relief. Effective October 9, 1997, however, DMA abandoned the disputed reimbursement methodology and adopted a completely different reimbursement scheme. The federal court then dismissed the hospitals' complaint without prejudice on mootness grounds.

They note that the provider agreements require DMA to reimburse the hospitals "for such claims, and in such amounts, as meet the provisions of the Georgia State Plan for Medical Assistance and attachments thereto [and] applicable federal and state law." They assert that the reference to "applicable federal law" requires compliance with the Boren Amendment. According to the hospitals, the 1996 plan violated the Boren Amendment both procedurally and substantively, because (1) the state did not make the requisite "findings" or "assurances" that the rates were adequate to meet the costs incurred by an efficient hospital, and (2) the rates were not in fact sufficient to cover such costs. The hospitals also claim that the recoupment of past profits constituted an unconstitutional taking of private property.

The trial court granted partial summary judgment to the hospitals, holding that the 1996 plan amendment violated the Boren Amendment both substantively and procedurally. The court did not, however, address whether such violations constituted a breach of the hospitals' provider agreements, nor did it purport to grant summary judgment on the hospitals' claim for breach of contract. The court did state in one sentence that "[t]he remedy for the violation is reimbursement of all actual allowable costs from August 15, 1996, through October, 1997," but it did not purport to grant summary judgment as to damages. Indeed, the court expressly stated that it denied all aspects of the hospitals' summary judgment motion except to the extent that it found a violation of the Boren Amendment. The court granted summary judgment to DMA on all other issues, including the "takings" claim.

On appeal, DMA contends that the 1996 plan did not violate the Boren Amendment, and that, even if it did, the trial court erred in fashioning a remedy. In their cross-appeal, the hospitals also contend that the trial court's remedy was improper. In addition, they claim that the trial court erred in granting summary judgment to DMA on their takings claim.

1. *Violation of Boren Amendment.* DMA does not deny that the Boren Amendment was incorporated into the provider agreement,[8] or that failure to comply with the Boren Amendment would constitute a breach thereof.[9] Rather, it simply claims that the trial court erred in

---

[8] DMA does assert that, because the Boren Amendment was incorporated into the contract only by reference to "applicable federal law," it is entitled to sovereign immunity. DMA claims that, because the Georgia Constitution waives immunity only for *written* contracts, and the Boren Amendment is not expressly included in the written contract, there is no waiver of sovereign immunity. See Ga. Const., Art. I, Sec. II, Par. IX (c). This contention is without merit. DMA cites no cases holding that a written contract may not incorporate matters by reference. The fact that the provider agreement requires reimbursement in compliance with the Boren Amendment does not render it any the less a written contract.

[9] The Supreme Court has held that "health care providers are the intended benefi-

finding that it violated the Boren Amendment in adopting the 1996 plan. We disagree.

Procedurally, the Boren Amendment requires a state to "engage in a 'finding' process that all federal requirements have been met," and to provide "assurances" to the HCFA that such requirements have been met.[10] A reimbursement plan adopted in violation of the Boren Amendment's procedural requirements is invalid regardless of whether the plan substantively complies with the statute.[11]

In discussing the statute's procedural requirements, the U. S. Supreme Court has held that

> the statute requires the State, in making its findings, to judge the reasonableness of its rates against the objective benchmark of an "efficiently and economically operated facility" providing care in compliance with federal and state standards while at the same time ensuring "reasonable access" to eligible participants.[12]

The Tenth Circuit has interpreted this procedural component as meaning that a state must

> *at a minimum*, . . . make "findings" which identify and determine (1) efficiently and economically operated hospitals; (2) the costs that must be incurred by such hospitals; and, (3) payment rates which are reasonable and adequate to meet the reasonable costs of the state's efficiently and economically operated hospitals.[13]

The Seventh Circuit, while rejecting the notion that a state must "identify a reasonable sample of particular existing [health care providers] as paradigms of efficiency," nevertheless recognizes that a state must determine "what it would consider to be efficient and economic . . . facilities and must make findings which establish a nexus

---

ciaries of the Boren Amendment," and that the amendment "creates a right enforceable by health care providers under [42 USC] § 1983." *Wilder*, supra at 509-510. We have found no cases specifically holding that compliance with the Boren Amendment may be enforced in a breach of contract action. To the extent that the amendment creates an enforceable right, and to the extent that compliance with the amendment is made a condition of a contract between the state and a health care provider, we see no reason why the provider may not enforce its rights through an action on the contract as opposed to a § 1983 action.

[10] *AMISUB*, supra at 796.

[11] See *Dept. of Health &c. Svcs. v. Alaska State Hosp. &c.*, 856 P2d 755, 764-765 (Alaska 1993); *Pinnacle Nursing Home v. Axelrod*, 928 F2d 1306, 1316-1317 (2nd Cir. 1991); *Americare Properties*, supra at 47.

[12] *Wilder*, supra at 519.

[13] (Emphasis in original.) *AMISUB*, supra. See also *Pinnacle Nursing Home*, supra at 1314 (favorably citing *AMISUB*'s three-part test).

between the costs of operating those facilities and the proposed reimbursement rates under the state plan."[14] The Alaska Supreme Court has stated that

> the findings requirement of Boren is designed to ensure that rates are not set arbitrarily, i.e., without proper consideration of the costs of operating a facility in the state. Therefore, we conclude that states must make concrete findings, based on studies of existing facilities, and use these studies to establish, with reference to either existing or hypothetical facilities, an "objective benchmark of an 'efficiently and economically operated facility.' "[15]

In reviewing the various approaches, the Fifth Circuit has noted that

> the findings requirement is not a mere formality that can be satisfied simply by having a state officer think a bit about hospital costs and then copy out the statutory language on a piece of paper, put the heading "assurances" on that piece of paper, and send it to HCFA. . . . As part of the factfinding process, the state agency must "judge the reasonableness of its rates against the objective benchmark of an 'efficiently and economically operated facility' providing care in compliance with federal and state standards while at the same time ensuring 'reasonable access' to eligible participants."[16]

In this case, it is undisputed that DMA did not conduct any factfinding process in an attempt to identify efficiently and economically operated facilities. Rather, DMA claims that it *assumed* all Medicaid providers in the state were efficiently and economically operated. It contends that this assumption validly discharged its duty to make findings regarding the costs that must be incurred by efficiently and economically operated facilities.

DMA's approach has been rejected by at least two courts. In *Abbeville Gen. Hosp. v. Ramsey*,[17] the Fifth Circuit held that Louisiana's Medicaid reimbursement scheme violated the procedural component of the Boren Amendment. The Louisiana Department of Health & Hospitals (LDHH) reimbursed 100 percent of hospitals' capital costs, educational expenses, and malpractice expenses. All

---

[14] (Punctuation omitted.) *Illinois Health Care Assn. v. Bradley*, 983 F2d 1460, 1464-1465 (7th Cir. 1993). See also *Pinnacle Nursing Home*, supra.

[15] *Alaska State Hosp.*, supra at 763, quoting *Wilder*, supra at 519.

[16] *Abbeville Gen. Hosp. v. Ramsey*, 3 F3d 797, 805-806 (5th Cir. 1993), quoting *Wilder*, supra at 519.

[17] Supra.

other operating costs were reimbursed either on a 100 percent basis or at a maximum level determined by the hospital's "target rate." The target rate was initially set based on the higher of the hospital's 1980 and 1981 average costs per Medicaid patient, as periodically increased for inflation.[18] Various hospitals challenged the reimbursement scheme, claiming that LDHH failed to procedurally comply with the Boren Amendment. LDHH admitted that it

> conducted no studies and made no efforts to determine which state hospitals are efficiently and economically run. Instead, LDHH functioned under the premise that every hospital was economically and efficiently operated in 1981 and used the available cost reports for that base year to calculate the target rates for each hospital.[19]

The Fifth Circuit held that the method by which LDHH calculated the target rates violated the Boren Amendment:

> Findings were not made, instead assumptions were made. It is circular for LDHH to set target rates under the assumption that all hospitals are efficiently and economically operated and then identify efficiently and economically operated facilities as those whose costs fall below their own reimbursement rate. . . . LDHH has reduced its findings process to a simple exercise of compilation and assumption, completely ignoring the Congressional mandate that state agencies consider relevant factors such as efficiency, economy, quality of care, and reasonable access. LDHH emphasizes that it has received relatively few complaints regarding hospital quality of care. This fact, however, says nothing about the reasonableness or adequacy of rates to meet the needs of efficiently and economically operated hospitals where rates initially set assume that every hospital is efficient and economic.[20]

The Court stated that it "cannot endorse such a pro forma compliance with the findings requirement of the Boren Amendment," and held that the hospitals were therefore entitled to summary judgment on the issue of procedural compliance.[21]

The Alaska Supreme Court considered a similar reimbursement

---

[18] Id. at 800.
[19] Id. at 806.
[20] Id. at 808.
[21] Id. at 810.

scheme in *Dept. of Health &c. Svcs. v. Alaska State Hosp. &c.*[22] In that case, the Alaska Medicaid agency did not attempt to identify efficiently operated facilities, but simply assumed that all state facilities were efficiently operated in a base year. The state then adjusted the base year costs for each hospital by an inflation figure, and set reimbursement rates based on the weighted average cost of facilities in the same class.[23] The Alaska Supreme Court held that this approach violated the Boren Amendment, stating that

> an assumption [that facilities operated efficiently in a base year] may ease the State's rate-setting work by readily providing a point of comparison, but it cannot satisfy the requirement that the states "find" rates that must be incurred by efficiently and economically operated facilities. . . . While the choice of certain base year rates may represent the costs that must be incurred by an efficient and economical facility, the State has made no findings that this is so.[24]

The reimbursement plan in this case suffers from the same defects as those in *Abbeville* and *Alaska State Hosp.* DMA did not conduct any factfinding investigation to determine the costs that would be incurred by an efficiently and economically operated hospital. Instead, it claims that it presumed that all hospitals in the state were efficiently operated, and then established each hospital's per case rate based upon the hospital's actual cost per patient in 1993, several years earlier. It then estimated that, in the aggregate, the anticipated reimbursements to Medicaid providers under the amended plan would be sufficient to cover the aggregate costs incurred by efficiently and economically operated facilities, even though many hospitals would receive reimbursements less than their actual costs.[25]

---

[22] Supra.

[23] Id. at 763.

[24] Id.

[25] DMA asserts that each efficiently operated hospital need not be reimbursed in an amount sufficient to cover its costs, but that it is enough that *aggregate* reimbursements to all hospitals are sufficient to cover the *aggregate* costs incurred by efficient hospitals. Consistent with DMA's position, some courts have held that "the issue [is] not whether the state's reimbursement rates [are] adequate as to a single provider, but rather whether the rates [are] adequate in the aggregate." *Drake Center v. Dept. of Human Svcs.*, 125 Ohio App.3d 678, 691-692 (709 NE2d 532) (1998). See also *West Virginia Univ. Hosp. v. Casey*, 885 F2d 11, 26 (3rd Cir. 1989) ("What matters . . . is whether the reimbursement rates . . . in the aggregate are arbitrary and capricious."). We question, however, whether a reimbursement methodology that singles out a group of admittedly efficient hospitals, providing that they will be reimbursed under a different formula than all other hospitals — a formula calculated to produce reimbursement rates lower than the hospitals' expected cost per patient

Even if an assumption could take the place of a finding, however, DMA's methodology suffers from an additional, and more fundamental, flaw, in that its proposed reimbursement scheme is inconsistent with its underlying assumption. If, as DMA asserts, all hospitals are efficiently and economically operated, then the costs actually incurred by such hospitals are, by definition, "the costs which must be incurred by efficiently and economically operated facilities." To be in compliance with the Boren Amendment, therefore, any plan must be calculated to reimburse, in the aggregate, 100 percent of the actual Medicaid costs incurred by all hospitals in the state.

As discussed above, DMA arrived at its per case rates through a three-step process. First, it determined the total Medicaid costs incurred by each hospital in a base year. It then used an "inflation trend factor" to predict total Medicaid costs in the current year. Finally, it divided the resulting amount by the number of Medicaid admissions in the base year to arrive at the per case rate, or the expected cost per Medicaid patient. If we accept the fundamental premise DMA claims underlies its reimbursement methodology — i.e., that every hospital in the state is efficiently and economically operated[26] — this figure represents the *minimum* amount that must be paid to health care providers to comply with the Boren Amendment. However, DMA's 1996 plan only pays this rate to *some* hospitals, while paying a lower rate to others. Thus, if every hospital is indeed efficiently and economically operated, the anticipated reimbursements under the plan would be insufficient, in the aggregate, to cover the anticipated costs incurred by such hospitals in providing Medicaid treatment.[27]

If, instead of making findings as to the costs incurred by an efficiently and economically operated facility, DMA wishes to rely on an assumption regarding such costs, it must at least establish reimbursement rates consistent with that assumption. In other words, it must establish "a nexus between the costs of operating those facilities and the proposed reimbursement rates."[28] Far from establishing

---

— complies with the Boren Amendment simply because the plan provides that other hospitals will be overcompensated. Nevertheless, we need not resolve this issue, as DMA's plan violates the Boren Amendment even under an aggregate standard.

[26] We must also assume, as DMA did, that base year costs, adjusted for inflation, are a reasonable proxy for the costs expected to be incurred several years later. Such an assumption is highly debatable; indeed, DMA admitted below that "the three year lag between the base data year and the reimbursement year allowed a disconnect to occur between payment and cost." Nevertheless, we may assume the assumption's correctness for purposes of evaluating DMA's plan.

[27] If, as DMA claims, aggregate reimbursements under its plan are sufficient to cover the aggregate costs incurred by efficiently and economically operated hospitals, it is only because DMA's assumption that all hospitals are efficient and economical is incorrect.

[28] (Punctuation omitted.) *Bradley*, supra.

a nexus, however, DMA instead adopted a reimbursement scheme that contradicts the very assumption on which it is allegedly based. It is thus apparent that DMA failed to make the findings necessary to justify the 1996 plan, and the trial court properly held that DMA procedurally violated the Boren Amendment in adopting the plan. Because failure to comply with the Boren Amendment's procedural requirements renders a state's Medicaid plan invalid, it is not necessary to consider whether the plan substantively complied with the Boren Amendment.[29]

2. *Remedy.* In its summary judgment order, the trial court stated that "[t]he remedy for the violation is reimbursement of all actual allowable costs from August 15, 1996, through October, 1997," although it did not enter a dollar judgment in favor of the hospitals, and indeed did not even discuss whether violation of the Boren Amendment would constitute a breach of the provider agreements. Both parties assert that the remedy described by the trial court is improper, although they disagree as to the proper approach. DMA argues that, if the 1996 plan was adopted in violation of the Boren Amendment, the appropriate remedy would be to order it to adopt a new reimbursement methodology consistent with the Boren Amendment's requirements. The hospitals, by contrast, argue that DMA should be required to make reimbursements in accordance with the previous plan.

Initially, we note that the trial court's statement as to the appropriate remedy appears to be mere dicta, and not part of the judgment. The hospitals moved for summary judgment only on the issue of breach, not on the issue of damages. The trial court's statement regarding the appropriate remedy was made in the context of analyzing DMA's compliance with the Boren Amendment. In actually rendering its judgment, however, the court stated that it granted the hospitals' motion for summary judgment only "to the extent that the Court finds Defendants procedurally and substantively violated the Boren Amendment to the Medicaid Act by failing to provide reimbursements that met actual allowable costs," and that it denied the motion in all other respects. Although the court clearly indicated what it believed to be the proper remedy for a violation of the Boren Amendment, it did not hold that the violation constituted a breach of the provider agreement, which was the theory of liability asserted by the hospitals, and did not enter any judgment as to damages. Nevertheless, even if the trial court's statement is properly classified as dicta, we believe it is appropriate to address this issue in order to

---

[29] See *Alaska State Hosp.*, supra at 764-765; *Pinnacle Nursing Home*, supra at 1316-1317.

provide clarity on remand.

Several courts in other jurisdictions have considered this issue and have concluded that, if an amended plan is invalid for failure to comply with the Boren Amendment, the previously existing plan remains in effect until such time as a new plan is properly adopted.[30] We believe this approach is the correct one, and is particularly apt where the plaintiffs are suing for breach of a contractual provision requiring reimbursements to be made in compliance with the Boren Amendment. Accordingly, the trial court's order is vacated to the extent that it purports to describe the appropriate remedy for a violation of the Boren Amendment. While DMA's proposed remedy — i.e., requiring it to establish a new reimbursement scheme that complies with the Boren Amendment — would be proper in a case involving prospective relief, it makes little sense in a case challenging reimbursements made years ago under a methodology that has since changed. Indeed, since DMA currently has a valid reimbursement scheme in place, it would be awkward, if not impossible, to require it to adopt a new reimbursement scheme that would comply with the repealed Boren Amendment while applying only to claims made by the plaintiff hospitals between August 1996 and October 1997, and then somehow obtain HCFA approval for such a retroactive plan.

3. *Takings claim.* The hospitals contend that the trial court erred in granting summary judgment on their "takings" claim, which asserted that the recoupment of their 1992 and 1993 profits violated the constitutional prohibition against taking private property without just compensation.[31] This contention is without merit. The 1996 plan did not "take" the hospitals' prior profits, but simply took the size of those profits into consideration in setting the reimbursement rates for services provided after August 15, 1996. Although this reimbursement methodology may have violated the Boren Amendment, it in no sense constituted a "taking," constitutional or otherwise, of spe-

---

[30] See *Missouri Dept. of Social Svcs. &c. v. Great Plains Hosp.*, 930 SW2d 429, 438 (Mo. App. 1996) (where amended plan held invalid for failure to procedurally comply with Boren Amendment, hospital "was entitled to be reimbursed pursuant to the previous unamended plan until such time as that plan is changed according to the applicable procedures"); *Avon Nursing Home v. Axelrod*, 83 N.Y.2d 977, 983 (639 NE2d 1124) (1994) (after amended plan invalidated by federal court for procedural violation of Boren Amendment, state court ordered Medicaid agency to "recalculate petitioners' reimbursement rates for the affected years under the previously existing rate structure"); *Volk v. State*, 104 Ore. App. 27, 37 (799 P2d 658) (1990) ("on invalidation of plan amendments, reimbursement must be made pursuant to the previous unamended plan"); *New England Mem. Hosp. v. Rate Setting Comm.*, 394 Mass. 296, 304 (475 NE2d 740) (1985) ("Where no effective new rate has been established, the old rate remains in effect.").

[31] See Ga. Const., Art. I, Sec. III, Par. I (a) ("[P]rivate property shall not be taken or damaged for public purposes without just and adequate compensation being first paid.").

cific money in which the hospitals had a property interest.[32] Accordingly, the trial court did not err in granting summary judgment to DMA on this claim.

4. *Conclusion.* For the reasons discussed above, the trial court correctly held that DMA procedurally violated the Boren Amendment in adopting the 1996 plan. The court's order is vacated, however, to the extent that it purports to describe the proper measure of recovery for a violation of the Boren Amendment. The trial court properly granted summary judgment to DMA on the hospitals' takings claim. We remand the case to the trial court for further action consistent with this opinion.

*Judgments affirmed in part and vacated in part and case remanded. Andrews, P. J., and Ellington, J., concur.*

DECIDED NOVEMBER 13, 2000 —
RECONSIDERATION DENIED DECEMBER 14, 2000 —

*Thurbert E. Baker, Attorney General, Dennis R. Dunn, Deputy Attorney General, William C. Joy, Senior Assistant Attorney General, Per B. Normark, Assistant Attorney General,* for appellants.

*Powell, Goldstein, Frazer & Murphy, James C. Rawls, V. Robert Denham, Jr., Sara K. Wheeler, Holly A. Pierson,* for appellees.

---

[32] See *State Bd. of Ed. v. Drury,* 263 Ga. 429, 433 (1) (437 SE2d 290) (1993) (property interest necessary for takings claim). See also *Oberlander v. Perales,* 740 F2d 116, 120 (2nd Cir. 1984) (no property interest in future rate of Medicaid reimbursements).